## RIVAS v. McALLISTER LIGHTERAGE LINE, Inc.

No. 110.

Circuit Court of Appeals, Second Circuit.

Nov. 2, 1945.

Writ of Certiorari Denied Jan. 14, 1946.

See 66 S.Ct. 480.

Russell C. Gay, of New York City, for appellant.

Joseph P. Feury, of New York City, for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a judgment entered upon the verdict of a jury in an action brought by the administratrix of Jose Rivas, to recover damages for his death. 46 U.S.C.A. § 688. The only question of any substance is whether there was enough evidence to support the verdict; hence a statement of the testimony in some detail is necessary. Rivas was the fireman of a steam lighter, plying in the harbor of New York; he was killed while in the fire room on the morning of August 24, 1943, no one else being present. Larsen, the engineer of the lighter, was then in the engine room above the fire room, of which, however, he had a limited view through gratings in the deck. The lighter had been moored at some distance from the end of a pier the night before, and, at breakfast the next morning, the captain ordered the crew to be ready to move up to the pier end, to receive their instructions for the day. At about eight o'clock, Rivas went to the fire room to make ready, and Larsen to the engine room above. While waiting for his signal, Larsen looked through the grating at his feet, saw Rivas cleaning the floor plates, and exchanged words with him. Soon thereafter the captain gave the "stand by" order—a "jingle" bell—which could be heard both in the engine room and in the fire room. The next bell was "slow ahead," immediately followed by "full ahead." The lighter took about five or ten minutes to move to the end of the pier— eight or nine hundred feet—and shortly before she came to a stop, the signal was given to reverse, followed by a stop signal. Larsen complied with both, and, almost immediately after the second, glancing into the fire room, he saw Rivas lying on the floor plates between the boiler and the engine. He at once went to the fire room and found Rivas on his back with the right side of his head, which lay uppermost, so badly crushed by some violent blow that the brain had oozed out. The blood had stopped flowing, and probably he was already dead, though this was not ascertained until a police surgeon arrived some time later and so pronounced him.

The case was submitted to the jury on the theory that Larsen, contrary to his testimony, had that morning found the crank of his engine at, or near, "dead-center," and, without warning Rivas, had put it in reverse in order to move the crank far enough so that he should be ready when he got the order to start. The theory then assumed that at that moment Rivas was standing on a railing which guarded the machinery and had been struck when Larsen put the engine in reverse. The plausibility of this conclusion rested on the following facts which were undisputed. The position of two "eccentric rods" determined whether the engine turned the shaft to drive the vessel forward or to reverse her. These rods were two vertical tubular members the lower ends of which were attached to the shaft, and the upper ends attached; one, to one end of two parallel "links"; the other, to the other end. The "links" threw the upper ends of the rods to port, to drive the vessel forward; to starboard, to back her. In the engine room was a hand lever which so shifted certain mechanism that the steam on admission drove the "links" and the ends of the rods with them, with great force to one side or the other. Had Rivas been standing on a railing which guards the rods, facing aft, to clean the engine frame, and had Larsen at that moment used the lever which threw the "links" to starboard (to reverse the engine) Rivas would have received a blow upon the right side of his head of just such a kind as in fact he did receive. The defendant vigorously insists that this is not the only explanation of what happened; and particularly that, as we have said, it directly contradicts the testimony of Larsen that he had not moved the rods before he got the "jingle" bell. As to the last, the jury were certainly not bound to accept that testimony, if there was good ground in the circumstances for disbelieving it. Larsen had every motive to deny having moved the rods without warning, after he learned that through his inattention he had killed Rivas. The case therefore comes down to whether there was any alternative theory which agreed with all the facts equally well, in which event, it is true that the plaintiff must fail.

We start with the certainty that Rivas was killed by being struck by some part of the machinery, moving with great and sudden violence; and that there was nothing which could have done this but the "eccentric rods" or the "links." If he had stood on the floor of the fire room leaning over the rail it is doubtful whether a blow from one of the rods could have caused the injury, for his head would in that case have been only three or four feet above the shaft and the lateral speed of the only part of the rod which could have struck him, would not have been great enough to injure him as he was injured. On the other hand, the ends of the "links" made a vertible hammer to crush his skull in just the way that it was crushed in fact. (Incidentally, it makes no difference in the defendant's liability whether he was standing on the floor, or on the rail; but the jury was free to believe that the "links" alone could have given the blow.) To this the defendant answers that, even assuming all we have suggested, there is no reason to attribute the reverse movement which killed Rivas to a time before the "jingle" bell, when there was concededly a reverse movement just before the vessel came to a stop at the pier end. If Rivas had been on the railing at that time, Larsen was not at fault.

Were there sufficient reasons for believing that he was struck by the earlier supposititious movement which Larsen denies? We think that there were. In the first place it was not likely that a fireman of experience should have exposed himself to such a danger, certain to arise, once the lighter started. The engine was almost sure to be reversed while she was moving up to the pier end; and, if during that period he did put his head where it would be struck, he was extremely careless of his safety. But that is not all. As we have said, when Larsen found Rivas in the fire room, immediately after he had stopped the engine, Rivas was no longer bleeding. That was only about a minute after Larsen conceded that he had reversed his engine. The police surgeon—the only witness upon the subject—swore that a man dying of such a blow as Rivas suffered would bleed for between five and ten minutes; and, if that is true, it followed that the blow could not have been delivered at the time for which the defendant argues. The defendant denies that the surgeon said this; it says that all he meant was that Rivas would not have bled more than five or ten minutes, leaving it indefinite whether he might not have stopped bleeding within the time between Larsen's admitted reversing of the engine and when he went to the fire room. We give the testimony in the margin,* from which it is apparent that the surgeon meant exactly what we have said. The first answer was to a question how long Rivas would have bled, not the maximum time, but the actual time. The second question asked him to put a minimum and maximum upon the period, and the answer was five or ten minutes. The answer to the fourth question was categorical that Rivas would have "continued" to bleed "during that five or ten minutes." The jury might of course have refused to believe this, but how it can be seriously argued that there was no testimony upon the point, we cannot comprehend. If they did believe the surgeon, they could not have avoided a verdict for the plaintiff. Indeed, had we been charged with deciding the facts, we should have unhesitatingly concluded that Rivas was killed exactly as the plaintiff argues.

As we have said, the other points are trivial and require no discussion. There is no merit in the appeal in any aspect.

Judgment affirmed.

---

* "Q. Now, Doctor, having observed that body could you tell us with a fair degree of certainty how long in your opinion that wound would have bled? A. Not more than a few minutes.

"Q. When you say a few minutes, Doctor, is there any minimum or maximum that you could give us? A. Well, I would say probably from the type of injury I saw the man couldn't have lived more than five or ten minutes at the most.

"Q. Couldn't have lived? A. That is right.

"Q. And would the blood have continued to come out during that period? A. During that five or ten minutes, yes, sir."