Larry **KLEPAL**, as Administrator of the goods, chattels and credits of Larry Klepal, Deceased, Plaintiff,

v.

**PENNSYLVANIA RAILROAD COM-PANY**, Defendant.

United States District Court,
S. D. New York.

March 29, 1955.

Sidney J. Ungar, New York City, for plaintiff.

Conboy, Hewitt, O'Brien & Boardman, New York City, for defendant, Joseph P. Allen, New York City, of counsel.

WEINFELD, District Judge.

The plaintiff-administrator brings this action to recover the pecuniary damages caused to the decedent's dependents by reason of his alleged wrongful death.

The decedent was last seen alive shortly after midnight on September 23, 1951 when he left a tavern in New York City where he had been drinking beer for several hours with a companion to whom he announced he was on his way to Astoria, Long Island City. His movements thereafter are unknown. However, at about 7:45 a. m. that morning, the crushed and dismembered parts of his body were discovered alongside and between the rails of No. 1 track at the Sunnyside yards of the defendant located at Astoria.

After the defendant's trains end their scheduled runs into the Pennsylvania Railroad Station at Manhattan, New York City, they proceed, via tunnels underneath the East River, into the Sunnyside yards which extend over a two mile area. We are here concerned mainly with the No. 1 tunnel and track which carried only eastbound traffic on the day in question.

As the trains leave the tunnel speed is decreased to between 15 to 20 miles per hour and they proceed on a straightaway, slightly upgrade, for a distance of about 1,500 feet to the F tower where an area known as the loop begins. The view from the exit of the tunnel to this point is clear and unobstructed. The loop extends a distance of 10,000 to 15,000 feet beyond the F tower to a point where the engine is detached from the cars. There the engine is taken to a roundhouse for inspection. The cars are also inspected and then routed to an area for washing.

To the right of the exit of No. 1 tunnel —that is, to the south—and running parallel to the outer or right rail of the tracks—but separated therefrom by approximately 6 feet, is an abutment or retaining wall that gradually tapers off to the level of the roadbed at a point 900 feet east of the exit. It was near the end of this abutment that the decedent's head, torso and hands were found scattered about. The entire Sunnyside yard is enclosed by a steel fence 6 feet high, which on the side nearest to the No. 1 track and abutment, is about 50 to 60 feet to the south of, and runs parallel to, said track and abutment.

About 800 feet westerly from where the deceased was found is a gate used as an entrance by employees working on the car washing machinery. This gate is closed from 11:00 p. m. to 7:00 a. m. but is open and unattended from 7:00 a. m. From the gate to the area where decedent's body was found the ground is level and is substantially free of obstacles. The gate entrance is 400 feet from where decedent had been employed. There is another gate on the opposite or north side at F tower, but to reach the No. 1 track one must use a stairway, down to track level, and then cross nine tracks.

For at least four hours prior to 7:00 a. m. when decedent's body was discovered, the only trains using the No. 1 tunnel and track were those operated on behalf of the defendant. From 6:40 a. m. to 7:16 a. m. four trains exited from the tunnel and passed the area where the parts of decedent's body were found. F tower was passed at 6:40 a. m. by train No. 102; at 6:45 a. m. by train No. 108; at 7:03 a. m. by train No. 66; and at 7:16 a. m. by train No. 86. Engineer Norton was in charge of the latter train,

which was the last over the tracks before decedent's body was found.

The engineer and firemen of the first three trains unequivocally stated they neither saw nor observed a body or any other object upon, at or near the area of the tracks where decedent's remains were found. The next train over the tracks was Norton's. He did not directly complete his run to the end of the loop but stopped his train about ¼ mile beyond where decedent's remains were found to telephone the observation tower. It was this telephonic report which led to the investigation.

There is contention as to whether Norton reported that he saw what appeared to be a human body on track No. 1 when he came out of the tunnel or reported "there was something on the track which I didn't know what it was which should be investigated".

Whatever the precise report, defendant's employees investigated and soon made the gruesome discovery. Members of the decedent's body were strewn alongside of and on the No. 1 track between 750 and 900 feet easterly from the exit of the No. 1 tunnel. One hand, severed at the wrist, was between the two running rails of the track; the other hand, also severed at the wrist, was between the south running rail and the retaining wall; the torso was against the retaining wall 6 feet from the right rail, and the decapitated head was caught between the guard rail and the running rail. The hands were about 750 feet and the torso about 900 feet east of the tunnel exit with the head about 10 feet easterly from the torso.

That the decedent was struck by a railroad train admits of no doubt. In-

deed, as much is conceded by the defendant, but it urges it "is impossible to state how or when decedent came to be struck". The plaintiff contends it was train 86 that struck and killed decedent. To succeed, he must establish this and also that the contact was due to Norton's negligence. Plaintiff, of necessity, was compelled to call various employees of the defendant as witnesses, including Norton, the engineer of train 86. Their pre-trial depositions were offered to establish a prima facie case and following the denial of the defendant's motion to dismiss for failure of proof, the defendant in going forward called a number of witnesses, also including Norton.

The case is governed in its substantive aspects, including the sufficiency of the evidence, by New York law.[1] In a death action a plaintiff is not held to as high a degree of proof of the cause of the accident as where the injured person can himself describe the occurrence.[2]

The essential elements of his claim, as to which he has the burden of proof, may be established by circumstantial as well as direct evidence. Circumstantial evidence is on no different or lower plane than other forms of evidence.[3] A plaintiff is not required to establish the specific cause of the accident or to eliminate every remote possibility that it might have been due to some cause other than the defendant's negligence. "It is enough that he shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred."[4]

Just as there can be no doubt that decedent was struck by a railroad

1. The action, originally commenced in the New York State Supreme Court, was transferred here by reason of diverse citizenship. Gutierrez v. Public Service Interstate Transportation Co., 2 Cir., 168 F.2d 678.

2. Noseworthy v. City of New York, 298 N.Y. 76, 80 N.E.2d 744.

3. Cf. United States v. Becker, 2 Cir., 62 F.2d 1007, 1010; Lukon v. Pennsylvania R. Co., 3 Cir., 131 F.2d 327, 329; Wood v. United States, D.C.S.D.N.Y., 125 F. Supp. 42, 48.

4. Ingersoll v. Liberty National Bank of Buffalo, 278 N.Y. 1, 14 N.E.2d 828, 830; see also Stubbs v. City of Rochester, 226 N.Y. 516, 124 N.E. 737, 5 A.L.R. 1396.

train, so there can be no question that he was a trespasser on the defendant's property and also guilty of contributory negligence. However, under New York law this does not necessarily defeat plaintiff's claim since recovery may still be had under the "last clear chance" doctrine.[5] But to succeed under this theory it must appear that (1) knowledge of decedent's peril was brought home to the defendant; (2) that it had an opportunity to avert the peril and its consequences; and (3) that there was a failure of reasonable effort to do so. A recent case has summed up the doctrine as follows:

> "Where a plaintiff has become, through his own prior negligence, so hopelessly implicated in a dangerous situation that he has lost all ability to extricate himself, responsibility for the ensuing accident may be shifted to the one who has a recognizable opportunity to save him."[6]

The case in large measure turns upon the testimony of Norton, which is so confused, contradictory, and admittedly mistaken as to a number of essential details as to seriously impair his general credibility.

█ A written statement given by Norton to the defendant shortly after the accident, his pre-trial deposition and testimony upon the trial are replete with contradictions on material points. Indeed, upon the trial the defendant urged that plaintiff should bear the burden of the contradictory statements contained in Norton's pre-trial deposition since it had been read as part of plaintiff's prima facie case. I do not agree. Norton, as the engineer of the train, charged with having caused the fatal accident, was an interested witness and his testimony must be viewed as such. Moreover, the plaintiff having been compelled to call Norton was not necessarily bound by his answers upon his examination before trial.[7]

█ Finally, the Court as the trier of the fact, no less than a jury, is not required to accept as true all testimony offered by a witness. Norton's credibility, as an interested witness, the reconciliation of his conflicting statements, what should be accepted and what rejected, the truthfulness or accuracy of his testimony whether contradicted or not, particularly so where contradiction is impossible, is for the trier of the fact.[8]

█ After a careful review of the trial minutes, my own trial notes, and based upon an appraisal of the credibility and demeanor of the witnesses who appeared upon the trial, I am satisfied that the plaintiff has sustained his burden of proof.

The first issue is whether it was Norton's train that struck the decedent. The evidence warrants a finding that no person or object was upon or adjacent to the No. 1 track from 6:40 a. m. to 7:03 a. m. when train No. 66 went by the F tower. No other train traversed the track until 7:16 a. m. when No. 86 passed by the tower. The inference is warranted that the decedent reached the area in the 13 minute interval. Just

5. Kumkumian v. City of New York, 305 N. Y. 167, 111 N.E.2d 865; Woloszynowski v. New York Cent. R. Co., 254 N.Y. 206, 172 N.E. 471; Bragg v. Central N. E. R. Co., 228 N.Y. 54, 126 N.E. 253.

6. Chadwick v. City of New York, 301 N.Y. 176, 181, 93 N.E.2d 625, 628.

7. Lee v. City Brewing Corp., 279 N.Y. 380, 384, 18 N.E.2d 628; Piwowarski v. Cornwell, 273 N.Y. 226, 228, 7 N.E.2d 111; Zumwalt v. Gardner, 8 Cir., 160 F. 2d 298, 302; Board of Trade of City of Chicago v. Tucker, D.C.W.D.N.Y., 202 F. 288; Wank v. Ambrosino, 307 N.Y. 321, 326, 121 N.E.2d 246, dissenting opinion of Chief Judge Conway, decided on other grounds.

8. Lee v. City Brewing Corp., supra, note 7; Goes v. Grifford Sales & Service, Inc., 265 App.Div. 796, 40 N.Y.S.2d 912, affirmed 291 N.Y. 744, 52 N.E.2d 959; Hukey v. Massachusetts Bonding & Ins. Co., 277 App.Div. 411, 100 N.Y.S.2d 643; Broadcast Music v. Havana Madrid Restaurant Corp., 2 Cir., 175 F.2d 77; Rivas v. McAllister Lighterage Line, 2 Cir., 151 F.2d 848.

how and where he managed to enter upon the enclosed yard has not been established. While it is not essential to a determination, most likely he gained entrance through the unguarded gate used by the car washing employees shortly after it was opened at 7:00 o'clock. And unless we are to engage in the violent and unwarranted assumption that he had been killed elsewhere and his dismembered remains placed about the area, it is clear that he was alive but in a drunken condition as revealed by the autopsy finding.

Whatever the contradictions in Norton's stories, one fact clearly emerges, and that is at a given point as he exited out of the tunnel he saw ahead some object that arrested his attention. What that object was; the distance at which he first observed it; whether it was distinguishable as man, dog, clothes, or as he once described it, a "ball or something"; whether it was on the track, off the track, or mostly on the side of the track, are the subject of varying versions.

First, as to whether Norton saw man, dog, or clothes. Was knowledge brought home to him that one was in peril?

Norton's written statement to his employer is in question and answer form. In response to the leading question "What can you state in reference to reporting a man's body lying alongside of the tracks on line 1, F tower", he replied: "I had left the tunnel, proceeding to F tower, about 15 mph when *I noticed on the engineer's side what looked like a body* lying alongside the track. My headlights had been burning until I went out into daylight, when I shut same off, and *when I saw what I took to be a body*, it was lying about 900 feet east of the tunnel, in the clear of the tracks. Upon arrival at the phone box on the loop, I called F tower and notified the operator of what I thought they would find, and then examined my engine

for any marks, and found none, because I knew my engine did not hit the person, as the body was clear of the track when I approached and passed." (Emphasis supplied.)

Subsequently, upon his examination before trial and at the trial, he placed the point of his observation variously from 900 to 400 feet, but insisted that he could not distinguish at those distances, or even after he had passed the object, whether it was a body or not. I am of the view that on this subject his original statement, made within three weeks after the occurrence, that he saw at a distance of about 900 feet ahead what he "took to be a body" is entitled to greater credence than his subsequent testimony. In any event, I am satisfied that whether it was at 900, 800, 650, 400–500, and certainly at no less than 400 feet,[9] he was alerted that a dangerous situation was ahead.

Next, as to the position of the body, Norton's written statement sets forth that it was "clear of the track" but here again there are subsequent contradictions. On several occasions Norton testified that the body was on the track but later changed this to accord with his original statement. Of course, Norton's claim that "my train did not hit the person as the body was clear of the track" and his other exculpatory statements must be viewed in the light of a strong motivation to absolve himself of responsibility for the death.

Upon all the evidence, including the physical factors, the inference is fully warranted, notwithstanding Norton's denial, that it was his train that struck and killed the decedent. In substance, evaluating his testimony in the light of his demeanor and contradictory statements, I am persuaded that as to many essential matters "the truth is the opposite of his story."[10]

The decapitation of the decedent, the complete severance and location of parts

---

9. Each of these figures was mentioned by Norton.

10. Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 269; Broadcast Music v. Havana Madrid Restaurant Corp., 2 Cir., 175 F. 2d 77, 80.

of his body, the finding of engine grease upon portions thereof, and the evidence of blood and particles of flesh on and between the tracks, warrant the inference that the decedent was upon the right-hand rail of the track when he was struck. Moreover, the decedent's torso was found against the abutment 6 feet to the right of the track, while Norton swears he saw the body at no more than 12 to 15 inches from the right-hand rail. The conclusion is compelled that Norton's train in striking the decedent threw the torso against the abutment. Otherwise the question arises: how did a dismembered body move 6 feet?

But whether on the track or alongside of it, is of no material consequence. Viewing Norton's testimony on this subject in its most favorable aspect to the defendant, he places what he saw at about a foot from the right running rail. The steel journal boxes of the engine are 12 to 15 inches, the pilot or cowcatcher 6 to 8 inches, and the passenger cars from 18 to 24 inches, above the tracks. The journal boxes extend beyond the rail, according to Norton, some 10 inches, and according to the assistant foreman of the maintenance department, 11 inches. There were 10 journal boxes on the right-hand side of the engine. Thus the overhang of the engine or the lower part of the 10 or more cars of the train could readily have struck the decedent if he were lying in such close proximity to the rail.

The defendant places much emphasis upon the fact that when the train and cars were inspected following the discovery of the body no evidence of blood, flesh or clothing was found upon them. It accordingly urges that such cases as Klein v. Long Island R. Co., 199 Misc. 532, 99 N.Y.S.2d 50, affirmed 278 App. Div. 980, 105 N.Y.S.2d 999, affirmed 303 N.Y. 807, 104 N.E.2d 364; Allen v. Stokes, 260 App.Div. 600, 23 N.Y.S.2d 443, and Gutierrez v. Public Service Interstate Transportation Co., 2 Cir., 168 F.2d 678, are inapplicable since in each the inference that an individual was struck was based upon physical evidence of contact found on the train or vehicle charged with having struck the decedent or injured.

I do not regard direct evidence of contact with a particular portion of the train as essential, where, as in this instance, other circumstances point in a most compelling way to the reasonable inference that it was Norton's train that struck decedent. His train had travelled more than two miles before it reached the end of the loop. It arrived there at 8:00 a. m., 44 minutes after the occurrence, and was inspected thereafter but exactly when is not altogether clear. The intervening time and the motion of the train in proceeding to the yard may well account for the absence of blood or flesh. Moreover, a police officer who arrived on the scene about 8:20 o'clock [11] testified that "there was blood and particles of flesh * * * on the tracks, in between the tracks."[12]

The defendant further contends that even if the inference that train 86 struck the decedent is warranted, negligence may not be attributed to Norton since that would be basing inference upon inference. However as to negligence, which we next consider, Norton's own descriptions of his actions or failure to act furnish sufficient upon which to predicate a finding of wanton negligence.

Norton, according to his original statement, saw "what looked to be a body lying alongside of the track" and according to subsequent versions he was uncertain as to what it was, but in any event placed it no more than 12 to 15 inches from the right rail. (We pass, for the moment, the finding that in fact the body was on the track.) For all he knew there was a person helpless, so

11. The time is converted from Daylight Saving to Eastern Standard Time.

12. While defendant's employees who found the body state they noticed no blood in the area, in the main they concede they did not look closely for such evidence. Under the circumstances this was understandable. As one witness put it, "I kept as far away as I could * * *".

close to the outer rail, as to be in imminent danger from the journal boxes or other parts of the train. His estimate of 12 to 15 inches made at a distance of from 900 to 400 feet could so easily have been mistaken, particularly with the illusion of converging track lines. His testimony on this subject is revealing, and the following is fairly typical of other testimony which, to be sure, he later sought to retract:

"Q. When you observed it [the body] was lying right next, if not on, the ties itself? A. Yes.

"Q. And there was a distance of approximately six feet from the rail to the wall? A. Yes.

"Q. Now, at the distance that you saw it, Mr. Norton, when you first observed it were you able to tell how close this was to the track at 400 or 500 feet away? A. I know it was close, yes.

"Q. And you know it was close, but how close you didn't know? A. No.

"Q. You couldn't tell the distance from the track at that far distance away? A. That is right.

"Q. But not knowing whether or not your train or parts of your train might contact or hit this object because of its closeness to the track you nevertheless didn't slow up? A. No."[13]

Again at another point he testified:

"Q. When, Mr. Norton, you saw this object approximately 400 or 600 to 650 feet in front of you alongside the track, as you used the expression, 'right alongside the track,' and you saw it definitely as either a body or a dog at a distance of about 400 feet, you nevertheless made no effort to bring your train to a stop to make certain that no part of your train came in contact with it or hit it; is that right? A. That is right."[14]

It was not until he passed by the "uncertain" object and travelled a quarter of a mile beyond that he first stopped his train and got out of his cab to report by phone that "something" was on the track that should be investigated.

If what he saw impelled him to interrupt his run so soon after passing it, the conclusion is warranted that a reasonably prudent person who could have stopped his train would have done so; that he would have investigated before rather than after passing it. Norton himself strongly suggested that prudence required him to follow such a course. Questioned as to his understanding of the defendant's safety rule when objects are on or near the track, he replied, "Whenever there is any doubt about any safety always stop and make sure. * * [T]he safe course must be taken, no risk run."

But Norton did not "stop and make sure". Instead he continued on his way without slowing down. He made not the slightest attempt to avoid hitting the object. Of course, if he knew a human being was in danger, his duty was clear. And if he was in doubt, his duty was no less imperative. Whether it was man, dog or object, in view of his claimed doubt, he was not free to gamble that a human being was not in peril. In the light of his own testimony, Norton's actions, under the circumstances, showed sheer indifference to what he knew or should have known was a dangerous situation—a reckless and wanton indifference to human life. Here indeed was "negligence so reckless as to betoken indifference to knowledge."[15]

The evidence is overwhelming that Norton could readily have stopped his train in time to avert the tragedy. He was proceeding up grade on a straightaway at 15 miles an hour and the view ahead was clear and unobstructed. The train, according to testimony of fellow engineers, which I accept, could have been stopped under emergency conditions

---

13. S.M. 77–78.

14. S.M. 74.

15. Woloszynowski v. New York Cent. R. Co., 254 N.Y. 206, 172 N.E. 471, 472.

within 150–200 feet, and certainly under 400 feet. Norton himself testified his train could have been brought to a halt in 400 feet. Thus whether he saw the object at 400 rather than 900 feet the train could have and should have been stopped before striking the decedent.

■ There remains for final determination the question of damages. The decedent was 31 years of age, unmarried and living with his parents, his sole dependents. In the the months preceding his death he contributed $25 a week, but the evidence does not indicate what amount was allocated for his room and board and what sum represented a contribution for their support. In view of testimony that previously, when his earnings had been greater, he paid $40 a week, of which sum $15 was for room and board, a finding is warranted that $12.50 of the $25 weekly payment represented his contribution for the support of his mother and father.

At the time of decedent's death his mother was 63 and his father 60 years of age. Considering the life expectancies of the decedent and his parents, his work habits, his regular contributions to them, they have been deprived of the reasonable expectation of his support at the rate of $12.50 per week, or $650 per annum, for the balance of their lives. The present value of such future payments must be determined. In view of the parents' obvious lack of financial experience, 3%, under present conditions, represents a fair rate of return without requiring more than average skill in investing.

According to the 1937 Standard Annuity Tables,[16] the present value of an annuity of $1 based upon their joint lives at 3% is $9.42, which multiplied by the annual contribution amounts to $6,123, representing the pecuniary damage.[17] To this sum must be added the reasonable funeral expenses of $1,775,

making a total of $7,898 which plaintiff is entitled to recover by reason of decedent's wrongful death.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Should either party desire specifically enumerated or further findings these may be proposed within five days from the date hereof upon two days notice.

Settle order on notice.

---

16. Published by Actuarial Society of America. Cf. United States Life Tables and Actuarial Tables, Federal Security Agency (Government Printing Office, 1947).

17. McKinney's, Consol.Laws, c. 13, Decedents Estate Law N.Y. § 132.