NECTAR KUMKUMIAN, as Administratrix of the Estate of MARTIN KUMKUMIAN, Deceased, Appellant, *v.* CITY OF NEW YORK, Respondent.

Argued January 13, 1953; decided April 9, 1953.

*Jacob D. Fuchsberg* and *Irving A. Thau* for appellant. I. The evidence fully warranted the jury in finding defendant liable under the doctrine of last clear chance, as enunciated in *Chadwick* v. *City of New York* (301 N. Y. 176). (*Cafaro* v. *City of New York,* 271 App. Div. 1024.) II. Plaintiff, proving that visibility of the roadbed, the construction of the tracks and the speed of the train were such that reasonable alertness on the part of the motorman would have avoided deceased's being struck by the train, established a prima facie case of negligence. (*Noseworthy* v. *City of New York,* 298 N. Y. 76; *Mikorski* v. *City of New York,* 270 App. Div. 769; *Stors* v. *Long Island R. R. Co.,* 266 App. Div. 1025; *Clarke* v. *City of New York,* 295 N. Y. 861; *Ziehm* v. *State of New York,* 270 App. Div. 876; *Trimble* v. *City of New York,* 275 App. Div. 169; *Sutton* v. *Erie R. R. Co.,* 145 App. Div. 122; *McCabe* v. *Richell Realty Corp.,* 248 App. Div. 743; *Frate* v. *State of New York,* 245 App. Div. 442; *Kennealy* v. *State of New York,* 135 Misc. 467; *Garrow* v. *State of New York,* 294 N. Y. 741.)

*Denis M. Hurley, Corporation Counsel* (*Joseph F. Mulqueen, Jr.,* and *Seymour B. Quel* of counsel), for respondent. I. The Appellate Division properly directed a dismissal of the complaint since there was no proof that the motorman actually knew of or had reason to apprehend deceased's presence in the tunnel. Since there was no evidence that the automatic operation of the brakes supplied actual notice to the motorman that anyone was in peril and since such operation of the brakes did not amount to proof supporting an inference of such notice in connection with the peril of deceased on the tracks, there was no basis for the verdict of the jury under the last clear chance doctrine. (*Elliott* v. *New York R. T. Corp.,* 293 N. Y. 145; *Panarese* v. *Union Ry. Co.,* 261 N. Y. 233; *Chadwick* v. *City of New York,* 301 N. Y. 176; *Wright* v. *Union Ry. Co.,* 224 App.

Div. 55, 250 N. Y. 526; *Bragg* v. *Central N. E. Ry. Co.,* 228 N. Y. 54.) II. There was no evidence upon which a recovery under the doctrine of ordinary negligence could be supported. There was no proof that deceased was ever in a position in front of the train in which the motorman could have seen him. Therefore, the motorman cannot be held negligent in failing to see deceased at a time when he had an opportunity of averting the accident. Moreover, the proof shows that deceased was a trespasser to whom defendant owed no duty save to refrain from wantonly and willfully injuring him. There is no proof of such conduct by the motorman. (*Reynolds* v. *New York Central & H. R. R. R. Co.,* 58 N. Y. 248; *Ruppert* v. *Brooklyn Heights R. R. Co.,* 154 N. Y. 90; *Allen* v. *Stokes,* 260 App. Div. 600; *McGoey* v. *City of New York,* 304 N. Y. 584.)

FROESSEL, J. Plaintiff brought this action to recover for the alleged wrongful death of her husband, who was struck in a tunnel by a subway train operated by defendant, the City of New York. The case was submitted to the jury on the theory of ordinary negligence as well as under the doctrine of last clear chance, with instructions to indicate upon which theory a verdict for plaintiff, if found, was based. The jury returned a verdict for plaintiff on the theory of last clear chance.

The trial court, by two separate orders, (1) granted defendant's motion to set aside the verdict and for a new trial, and (2) denied defendant's separate motions to dismiss the complaint and for a directed verdict. The Appellate Division modified the order first above mentioned " on the law and the facts by setting aside the verdict and dismissing the complaint ", and reversed the second order on the law, granting the motions " to dismiss the complaint " and for a directed verdict in favor of defendant.

Decedent, thirty-nine years old, was a Western Union messenger in his home city of Philadelphia, using his own automobile in his work. Because it was undergoing repairs, he left his home, without a bag, on January 23, 1945, for a brief " vacation " in Atlantic City. While away, an upstairs neighbor, at the request of his wife who stated he had been sick, listed his name with the local police as a missing person. His wife and cousin testified that each had spoken with him on the tele-

phone on January 25th, when he stated he would come to New York the following day. Nothing further is known of decedent's movements until his body was discovered under the subway train on the following morning as hereinafter set forth.

At about 9:00 A.M. of January 26th, a local subway train, en route to Coney Island from Manhattan on the B. M. T. line in Brooklyn, was being operated between the Prospect Avenue and 25th Street stations. The train was composed of five cars, one a freight car. The only employees thereon were a motorman and a conductor, the latter being stationed in the fourth car. The tunnel between the two stations is about 2,000 feet long and is straight, with a slight downgrade from Prospect Avenue to 25th Street. A " bench walk " forming a narrow (two feet) continuation of the station platforms runs along the tunnel wall between the stations with a handrail next to the wall. Below and adjoining the bench walk are the third rail, then the running rails, and finally a wall separating the local from the express tracks.

The motorman was coasting on the slight grade at a speed of about 12 or 15 miles per hour, when at a point about 1,400 feet from the Prospect Avenue station and 600 feet from the 25th Street station his train came to an emergency stop. This was a " surprise " to him, as it was caused by the automatic emergency equipment, which he testified may be actuated in one of three ways: (1) by the blowing of an electric pneumatic valve; (2) by a passenger pulling the emergency strap, or (3) by the operation of a tripping device under each car indicating that some object or body had come in contact therewith.

When the train had stopped, the motorman made no effort to investigate, but merely reset the brakes by pressing a button in his cab two or three times and proceeded, a matter of a few seconds. He must then have known that the valves were functioning. After proceeding " About a car length " — 67 feet — the train again went into emergency, and again the motorman reset the brakes, and started the train without making any attempt whatsoever to find out what was wrong. The conductor also did nothing, although he knew the first two stops were emergency stops. Again in approximately a car length — the distance between the tripping devices — the emergency brake stopped the train for the third time.

Both motorman and conductor then inspected the valves and found them in order. There was no evidence that anyone had pulled the emergency strap. They thereupon walked through the train, and when they opened the door of the third car they found decedent's body " wedged " between the third rail and the running rail on the right side of the fourth car. Evidence of blood, flesh and clothing was found on the brake rigging of the third and fourth cars on the right side of the wheel trucks. Nowhere else was found any physical evidence of the accident. The motorman stated the body was then " actually steaming."

An inspection of the train disclosed that the tripcock mechanism was in proper order. This is a device which hangs down outside the left front and right rear wheels of each car, about two inches above the track. It is so designed that it will move upon striking any object or body in the roadway and so open a contact causing the brakes to operate. It is returned to the normal operating position when the motorman resets the brakes. It may be noted that apparently there is no prescribed procedure when an emergency stop occurs, for the rule book was produced at the trial but not referred to by either side. The cause of death, according to the medical examiner, was " multiple extreme injuries ", the external injuries being multiple amputations and fractures. No alcohol was found in the liver.

The jury and the courts below were clearly right in declining to fasten liability on the theory of ordinary negligence. There is no evidence as to how decedent came into the subway tunnel. Plaintiff's speculation as to how he came into the subway, and from which station he had traveled the long distance into the tunnel, is based wholly on conjecture, or, as the Appellate Division put it, " upon inference heaped upon inference " (280 App. Div. 32, 35). Any recovery, if at all sustainable, could not be based on ordinary negligence. The indisputable fact remains, even if we accept plaintiff's theory, that decedent left the lighted platform, and walked 1,400 feet (about six or seven city blocks) into the dimly lit tunnel on a narrow walk, the tunnel wall on one side of him and the tracks just below. It is inconceivable that the least perceptive of men would fail to realize the danger of such a course. He had no right to be there. No reasonable man could classify such conduct as anything but negligence, and so we

conclude, as the jury must have by failing to find for plaintiff on the theory of ordinary negligence, and as did the Appellate Division in holding that decedent was guilty of contributory negligence as a matter of law.

That leaves for consideration the last clear chance theory upon which the jury rendered its verdict for plaintiff. We have noted that this doctrine does not apply unless there is present an issue of contributory negligence (*Lee* v. *Pennsylvania R. R. Co.*, 269 N. Y. 53, 55). There must be a time sequence — an interval in which plaintiff's act of negligence is complete and in which defendant has an opportunity to avert the disaster (*Panarese* v. *Union Ry. Co.*, 261 N. Y. 233). Where defendant thus had a last clear chance to avoid the accident, it may be said that plaintiff's negligence is not the proximate cause of his injury (*Bragg* v. *Central N. E. Ry. Co.*, 228 N. Y. 54).

In the last-cited case, a railroad employee fell asleep close to the rails and was struck by a train. We noted that the railroad could not be held liable merely because the engineer failed to see him in time, or even because he assumed Bragg would get off the tracks when a warning signal was given (cf. *Klein* v. *Long Island R. R. Co.*, 303 N. Y. 807), and said (p. 57): " Only, when he discovered that Bragg was inert or unconscious, or for some reason would not or could not safeguard himself had the engineer any reason to anticipate an accident. Only then should he have sought to avoid it."

Later, in *Woloszynowski* v. *New York Central R. R. Co.* (254 N. Y. 206, 208–209), Chief Judge CARDOZO, speaking for the court, summarized the now familiar rule thus: " The doctrine of the last clear chance, however, is never wakened into action unless and until there is brought home to the defendant to be charged with liability a knowledge that another is in a state of present peril, in which event there must be reasonable effort to counteract the peril and avert its consequences * * *. Knowledge may be established by circumstantial evidence, in the face even of professions of ignorance * * * but knowledge there must be, *or negligence so reckless as to betoken indifference to knowledge.*" (Emphasis supplied.) In that case the engineer and fireman were absolved of liability for a mere error of judgment in the emergency presented when they

learned of decedent's plight, for they " did not stand by inert and callous, unwilling to do anything."

We have recently applied the doctrine in a factual context somewhat different from previously decided cases (*Chadwick* v. *City of New York*, 301 N. Y. 176, 181). A truck driver was attracted by a hand rapping at his window, an attempt, by one of two boys who had " hitched " a ride, to stop the truck because the other was in danger of falling off. We there noted that the doctrine is not limited to " situations where a defendant has precise knowledge of both the exact nature of the danger and of the particular individual threatened so long as there is proof to support an inference that someone is in peril ", and that it was clearly the import of our later decisions " that when the defendant first became conscious of the impending danger and whether he then did all a reasonable man would under the circumstances to prevent disaster were questions of fact for the jury."

The case at bar comes within the principles enunciated in the foregoing authorities. It is important to keep in mind, moreover, that this is not the ordinary case of a man being run down by a train in a tunnel, where there is nothing a motorman could have foreseen or done to prevent the accident, as, e.g., *McGoey* v. *City of New York* (304 N. Y. 584). Such cases have been properly disposed of upon the ground that mere failure to see the victim is ordinarily insufficient to support a recovery. Here the jury had the right to find that the automatic equipment stopped the train in time to have saved decedent's life, and we are concerned only with what happened after that, not with the motorman's initial failure to see decedent.

Manifestly the purpose of the emergency equipment is to stop the train when danger threatens, unknown to the operating personnel, thus giving them opportunity to take measures appropriate to the situation. The tripcock mechanism is not placed on the cars as an ornament, nor does it serve as a fender; it is a warning device that operates the brakes — to save human life and prevent injury. It is not installed to function when the motorman sees an object on the tracks, for then *he* stops the train. Nor is it present to obviate serious collisions, for then it could not function in time. It must have at least as one of its

primary purposes the protection of life, in the light of the possibility that employees or others will at times be in dangerous proximity to the tracks. Indeed, it is not altogether unknown for " passengers " so to trip the brakes, even within the confines of the tunnel (see *Matter of Kleid* v. *Carr Bros.,* 300 N. Y. 270).

In the case before us, the brakes were tripped, not once or twice, but thrice. The motorman and conductor, both experienced men, made no investigation and took no corrective action until after the third stop, although there was ample time to have done so. The motorman did not so much as open the door and glance the length of his own car, but, " Without any lapse of time, except the time necessary to perform the operations ", he reset the brakes immediately after each of the first two stops, an act which in itself could be found to have been sufficient to apprise him that the emergency system was in good working order.

The evidence in this record would support an inference that decedent was struck successively by the tripcocks of the first, second and third cars, thus actuating the brakes. Moreover, the inference is permissible that the fatal injuries were not incurred until after the second stop and were received under the third and fourth cars of the train. In view of the medical examiner's opinion, and the evidence that the most serious injuries were incurred upon contact with the wheel trucks of those cars, such evidence was sufficient to support that inference (see *Hawkes* v. *Goll,* 281 N. Y. 808; *Jones* v. *New York Central & H. R. R. R. Co.,* 28 Hun 364, affd. 92 N. Y. 628), particularly in a death case (*Noseworthy* v. *City of New York,* 298 N. Y. 76; *Braun* v. *Buffalo Gen. Elec. Co.,* 200 N. Y. 484, 496).

Surely we cannot say, as a matter of law, under the last clear chance doctrine, that the motorman and conductor were not negligent in *twice* disregarding the emergency equipment, which is not placed in service to be ignored, and were merely chargeable with an error of judgment. At least it became a question of fact as to whether such conduct constitutes " negligence so reckless as to betoken indifference to knowledge " (*Woloszynowski* v. *New York Central R. R. Co., supra,* p. 209), and whether they " ignored the warning ", like the driver in the

*Chadwick* case (*supra,* p. 180), while there was still opportunity to avoid the accident. It matters not that they received the warning through a faultless mechanical instrumentality rather than a human agency, so long as they had, as we said in the last-cited case, " the requisite knowledge upon which a reasonably prudent man would act " (p. 181). The jury was entitled to find that lack of knowledge on the part of defendant's employees as to decedent's position of danger did not come about through mere lack of vigilance in observing the tracks, but rather as the result of their own willful indifference to the emergency called to their attention by the automatic equipment, to which clear warning they paid no heed. When they did belatedly carry out their plain duty to investigate, they found decedent, and it may be inferred that they would have seen him had they carried out that duty after the second stop — still belatedly, yet in time to have saved his life. We are of the opinion that plaintiff made out at least a prima facie case under the doctrine of last clear chance.

The judgment appealed from should be reversed and a new trial granted, with costs to abide the event.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, and DYE, JJ., concur with FROESSEL, J.; FULD, J., dissents and votes for affirmance in the following memorandum: This is not, in my view, a case for the application of the doctrine of the last clear chance. Certainly, neither the motorman nor the conductor knew that any person was in peril in time to have prevented his death, and the evidence is insufficient to support the inference that they *should* have known. I would affirm the judgment in defendant's favor.

Judgment reversed, etc.