Patricia **SAWYER,** Administratrix of the Estate of Robert H. Sawyer, Deceased, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

Civ. A. 62–C–452.

United States District Court
E. D. New York.

March 10, 1969.

Clare J. Murphy, Chicago, Ill., James Dempsey, White Plains, N. Y., and James A. Dooley, Chicago, Ill., for plaintiff.

Vincent T. McCarthy, U. S. Atty., for the Eastern Dist. of New York, W. A. Crawford, Jr., Sp. Asst. to Atty. Gen. of the U. S. and Lawrence J. Galardi, Asst. Chief, Tort Section, U. S. Dept. of Justice, of counsel.

ABRUZZO, District Judge.

This action, which is founded on the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) et seq., was instituted by the plaintiff, Patricia Sawyer, Administratrix of the Estate of Robert H. Sawyer, against the United States of America to recover damages for the alleged wrongful death of Robert H. Sawyer, who was the pilot in command of United Air Lines Flight 826, a DC–8 aircraft owned and operated by United Air Lines, Inc., when it collided, on December 16, 1960, with an aircraft owned and operated by Trans World Airlines, Inc. at an altitude of approximately 5,000 feet in the air space above Miller Army Air Base, Staten Island, New York. This collision resulted in the death of all persons on board each aircraft (128 persons in all).

John Walter Warren, manager of a lumber yard adjacent to Miller Army Air Base, testified by deposition that from the ground he saw both planes collide over the base; also both parties concede that the aircraft collided above Miller Army Air Base.

Plaintiff alleges that the collision was caused by the negligence of defendant. Liability is the only issue being determined at this time. The issue of damages will be tried, if necessary, after the determination of the issue of liability.[1]

---

1. Greenwich Mean Time (GMT) is used as a time reference throughout this opinion, in that it is the time used by all air transport control facilities and is the time shown in transcripts of all radio transmissions and in other conversation recordings introduced into evidence. Eastern Standard Time is 5 hours earlier than Greenwich Mean Time.

## BACKGROUND AND FACTS

This action was originally commenced on or about September 14, 1961 by service of a complaint filed in the United States District Court for the Southern District of California, which was later superseded by an amended complaint filed in that Court on or about October 31, 1961. By order of the United States District Court for the Southern District of California, Central Division, dated April 25, 1962, this action was transferred to the United States District Court for the Eastern District of New York, for all purposes. It was then ordered consolidated with all other actions pending before this Court arising out of the collision of December 16, 1960, for purposes of discovery.

Consolidated depositions were ordered by this Court to be taken before Special Master, the Hon. Harold McNiece. These depositions commenced on February 18, 1963 and concluded on September 30, 1963. On May 17, 1967, this Court ordered this action to be set for trial June 6, 1967, as a Rule 2 case. Thereafter, on May 25, 1967, more than 4 and ½ years after this action was commenced and more than 3 and ½ years after the close of discovery depositions, plaintiff filed a "Request for Admissions of Facts," which included 329 Requests for Admission. Defendant filed its Objections and Plaintiff's Requests were stricken; plaintiff, however, was afforded further time in which to examine depositions taken in this Court. This action finally reached this Court for trial on October 30, 1967, at which time trial testimony was begun.

The plaintiff produced two live witnesses at the trial, Robert Selsdorf, a United Air Lines pilot in captain's status and Patricia Sawyer, plaintiff-administratrix herein. Plaintiff rested her case on October 31, 1967, with the right to rely on deposition testimony and the exhibits mentioned therein as part of her proof. Defendant completed its trial testimony on November 13, 1967, producing no live witnesses and choosing to rely solely on deposition testimony and the exhibits mentioned therein as its proof. Plaintiff was granted until December 19, 1967 to submit her brief and the government was granted until January 22, 1968 to submit its brief, with any reply brief by the plaintiff to be submitted wihin ten days, thereafter.

Plaintiff requested an extension and was granted until Februray 1, 1968 to submit her brief and the defendant was requested to submit its brief one month thereafter. In the interim, trial counsel for the defendant became ill and was hospitalized and this court granted defendant further time to submit its brief. It was then found that defendant's counsel was in extremis and when it became apparent that he would not recover from his illness, the defendant had to appoint new counsel to complete this case. Because of the need for new counsel to familiarize himself with this matter, the defendant was granted until June 21, 1968 to submit its brief. Defendant filed its brief with the Court on June 21, 1968. Plaintiff was thereafter granted until the beginning of the September term to file her reply brief. This brief was filed in the Court on September 2, 1968.

United Air Lines Flight 826 (hereinafter referred to as UAL 826), a DC–8 turbo-jet aircraft, departed from Chicago, Illinois at approximately 1411 GMT, bound for Idlewild Airport (now John F. Kennedy International Airport) New York, its scheduled destination. Trans World Airlines Flight 266 (hereinafter referred to as TWA 266), a propeller driven Lockheed Constellation, was enroute from Columbus, Ohio to LaGuardia Airport, New York.

Each of the aircraft was being operated under Instrument Flight Rules (IFR). All aircraft operating under IFR are provided air traffic control services by facilities operated by the Federal Aviation Agency (FAA) pursuant to Section 307(b) of the Federal Aviation Act of 1958 (49 U.S.C. § 1348

(b). This service is provided in part for the purpose of permitting the orderly and expeditious flow of air traffic.

In the New York area, the air traffic control services were provided by the New York Air Route Traffic Control Center, located at Idlewild, through airport traffic control towers. Specifically designated airspace was alloted to each of the towers. The air traffic control services were carried out through a system of air traffic clearances issued from the towers. In the Control Center operation, airspace within these jurisdictional areas was divided into 18 sectors, each manned by 1 to 5 persons, designated as controllers, assistant controllers, or coordinators.

All aircraft operating under IFR were required to have 2-way radios, which had to be kept tuned to an assigned frequency.

It was the duty of the controller to issue clearance to an airplane which would provide for separation from all other instrument flight aircraft in his sector in accordance with fixed minimum standards. These standards provided for a minimum of 1,000 feet vertical separation or 10 minutes of longitudinal separation if the aircraft did not have vertical separation, or by a minimum of 3 miles using radar. It was the responsibility of the controller to issue clearance which would provide this separation.

It was the procedure of the center to clear an aircraft enroute or inbound to one of the New York airports by directing it to proceed by a specified route to a clearance limit intersection or fix (these clearance limit intersections or fixes are clearly depicted on air navigational charts). Transfer of control of an aircraft was then made to an approach control tower to clear an aircraft to proceed beyond a fix for the airport of intended landing. In effecting transfer of control to a tower, the center controller would instruct an aircraft to change its radio communications frequency to that assigned to the approach control position at the tower. The aircraft would then switch its radio from the center frequency to the tower frequency and would call Idlewild Approach Control, giving its altitude and position. After 2-way communication had been established, the Approach Control would complete the transfer of control by issuance of a new clearance for the aircraft to proceed on a specified route or heading away from the fix or previous clearance limit, followed by other clearances to descend and vectors based on the use of radar to direct the aircraft to a final approach course and also to provide adequate spacing between it and other in-bound aircraft, either preceding it or following it (a vector is a direction to turn right or left given to the aircraft by the ground controller).

If an aircraft does not receive a new clearance by the time it reaches its clearance limit, it is required to hold its position by flying an elliptical pattern around the fix at its last assigned altitude until clearance to proceed beyond the fix is issued. This holding airspace pattern area exended 4 miles northeast from the aircraft's clearance limit or fix.

A pilot can also locate his clearance limit intersection or fix from a stationary ground transmitter maintained by the FAA. The ground transmitter continually (24 hours a day, 365 days a year) transmits radio signals once every 10 seconds on each azimuth or ground direction around a 360 degree circle and, by using his navigational instruments, a pilot can locate a particular fix or point in the airspace.

As previously stated, UAL 826 departed from Chicago bound for Idlewild Airport, New York, entered the New York Center's jurisdiction in Pennsylvania and established radio communications with the Center at 1513 GMT, reporting its altitude as 27,000 feet. Shortly thereafter it was cleared to descend to 25,000 feet and at approximately 1516 GMT was issued an air traffic clearance by Donald Dacey, Air Traffic

Controller at Sector RR–18 in the Center, as follows:

"United 826, clearance limit is the Preston [2] intersection via jet 60 Victor Allentown direct Robbinsville, Victor 123. Maintain flight level 250."

UAL 826 acknowledged receipt of this clearance and repeated it back.

When UAL 826 reached the vicinity of Allentown, Pennsylvania at approximately 1522 GMT it was cleared to descend to 13,000 feet and instructed to change its radio frequency to that of the RR–5 sector at the Center. It then established 2-way radio communication with Ronald DiGiovanni, the controller at the RR–5 sector, who identified a "blip" on his radar scope in the vicinity of Allentown as UAL 826 and notified UAL 826 that it was in "radar contact." At approximately 1525 GMT, the RR–5A controller at the Center issued a revised clearance as follows:

"826 cleared to proceed on Victor 30 until intercepting Victor 123 and that way to Preston it will be a little bit quicker."

This revised clearance, which shortened the route to the Preston clearance limit by approximately 11 miles, was acknowledged accepted by the crew of UAL 826. At approximately 1530 GMT, UAL 826 was cleared by the RR–5A controller to descend to and maintain 5,000 feet. UAL 826 acknowledged this and notified the Center that it was "leaving 14." The Center inquired whether UAL 826 would be able to make the descent to 5,000 feet by the time the flight would arrive at Preston and 826 replied that they would head it "right on down * * *" indicating they would attempt to complete their descent to 5,000 feet by the time they arrived at the Preston clearance limit. UAL 826 proceeded along Victor 30 until it approached Victor 123 and then turned toward the northeast and proceeded along Victor 123 toward the Preston intersection.

At approximately 1532 GMT, UAL 826 was advised by the controller of the procedure to be followed at the clearance limit, as follows:

"United 826 if holding is necessary at Preston, southwest one minute pattern right turns on the zero five zero radial of Robbinsville. The only delay will be in descent."

This communication was acknowledged by 826 and under the established air traffic procedures this meant that when 826 reached the Preston intersection clearance, it was to make a right turn after passing the intersection and fly an elliptical pattern based on the intersection until further clearance to proceed beyond Preston was issued (Flight Information Manual, pp. 76, 77—TWA Exhibit C).

When UAL 826 advised the controller that it was "out of six" (meaning it had descended below 6,000 feet), it was told that radar service was being terminated and was instructed to change to another radio frequency and contact Idlewild Approach Control. It changed its frequency, called Idlewild Approach Control and reported it was "approaching Preston at 5,000." It was then given a message by Idlewild Approach Control regarding the weather conditions at Idlewild. This message was concluded at 1533:54 GMT. No further communications were received from UAL 826. No clearance to proceed beyond the Preston clearance limit was issued, yet. it proceeded approximately eleven statute miles northeast of the Preston intersection and collided with TWA 266 above Miller Army Air Field in Staten Island. The holding airspace pattern area for Preston extended four miles northeast of

2. Preston was an air navigation intersection determined by aircraft by cross bearings on ground radio transmitters. A Victor is an airway or air road and is depicted on air navigational charts. Robbinsville is a geographical location at which the FAA maintains a stationary ground transmitter. It is one of three ground trasmitters which would have enabled the aircraft involved in this action to determine their locations. The other two are Solberg and Colts Neck.

the Preston intersection, thus, at the time of the collision, UAL 826 had proceeded approximately seven miles beyond its maximum holding position.

A pilot attempting to locate a particular fix or intersection would use primary navigational aids in his aircraft. UAL 826 was equipped with two sets of primary navigational aids. These are referred to as VOR systems (Visual Oral Range). Within each set are two instruments which are used mainly for radio navigation along Victor airways, the pictorial deviation indicator (PDI) and the radio magnetic indicator (RMI). These instruments would be used by a pilot attempting to locate a particular fix formed by the intersection of two radio beams or radials emanating from ground transmitters. Along Victor 123, pilots locate the Preston intersection by using the 346° radial off Colts Neck. This stationary ground transmitter is mainained by the FAA and transmits radio signals on each azimuth or direction around a 360 degree circle.

TWA 266 was inbound to LaGuardia Airport from Columbus, Ohio. It had been cleared by the New York Air Route Traffic Control Center to the Linden (New Jersey) intersection. Prior to its arrival at Linden, it was advised to change to the LaGuardia Approach Control frequency and it did. It informed LaGuardia Approach Control that it was "by Solberg at 9,000" which meant that it had passed the Solberg VOR ground radio transmitter station at 9,000 feet. The LaGuardia Approach controller, William L. Smith, at the AR–1 position cleared TWA 266 to descend to 6,000 feet and told it to maintain its heading for radar vectors. It was cleared to turn right to 130 degrees to its final approach course for a landing on Runway 4 at LaGuardia. A short time thereafter, TWA 266 received another vector, "make that further right 150." The purpose of this vector was to provide proper spacing between it and another aircraft, Capitol 132, which was preceding TWA 266 inbound to LaGuardia. At this time Smith noticed an unidentified aircraft approaching from the southwest on his radar scope and advised TWA 266 of this, "and Trans World 266 traffic at 230 six miles northeast bound." TWA then reported its altitude as 5,500. It was cleared to descend to 1,500 feet and given another vector to turn left to a heading of 130. TWA 266 was also advised by Smith, "Roger, that appears to be jet traffic off your right now three o'clock at one mile northeast bound." This last communication was not acknowledged by TWA 266 and shortly thereafter 266 was seen to merge with the unknown blip on the radar scope, and controller Smith and others in the Control Tower at LaGuardia heard the sound of an open microphone and screaming voices, and then silence.

It is necessary to point out that when Smith saw a blip (plane) approach TWA 266 he would know that two planes were approaching each other. However, he could only know the altitude of the TWA plane. The other plane could be at an altitude higher, lower or at the same altitude. Insofar as it can be determined from the known facts, TWA 266 complied with each of the vectors and altitude clearances issued to it by LaGuardia Approach Control and was descending in accordance with these traffic clearances at the time the collision occurred.

The decedent, a Califonia resident, was the pilot in command on board UAL 826 which left Chicago bound for New York. He died as a result of this collision.

■ This action is somewhat complex and involved because there were no survivors and although the trial transcript is very short, there are over 15,000 pages of deposition testimony. Therefore, in accordance with the following from Bradford Builders, Inc. v. Sears, Roebuck & Co., 270 F.2d 649, 653 (C.A. 5th):

"It is hornbook law that evidence coming from witnesses on the opposite side (as well as from its own witnesses) is available to any party to a law suit."

this Court is going to use the testimony adduced by all of the parties in determining the liability, if any, of the defendant. This is also the applicable law in New York. See Tumulty v. N. Y., N. H. and H. R. Co., 224 App.Div. 131, 229 N.Y.S. 700; and Alpine Forwarding Co. v. Pennsylvania R. Co., 60 F.2d 734 (C.A. 2nd).

UAL 826 and TWA 266, on December 16, 1960, were being operated under Instrument Flight Rules (IFR), which are contained in Part 60 of the Civil Air Regulations (14 C.F.R. 60). These regulations were prescribed by the FAA, as authorized and directed by Congress in the Federal Aviation Act of 1958, Section 307 (49 U.S.C. § 1348(c), which provides:

Sec. 307

* * * (c) The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

Several petinent sections of Part 60 are quoted here for ready reference:

§ 60.2 Authority of the pilot. The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. In emergency situations which require immediate decision and action the pilot may deviate from the rules prescribed in this part to the extent required by consideration of safety * * *

§ 60.10 Application. Aircraft shall be operated at all times in compliance with the following general flight rules and also in compliance with either the visual flight rules or the instrument flight rules, whichever are applicable.

§ 60.21 Adherence to air traffic clearances. When an air traffic clearance has been obtained under either the VFR or IFR rules, the pilot in command of the aircraft shall not deviate from the provisions thereof unless an amended clearance is obtained. In case emergency authority is used to deviate from the provisions of an air traffic clearance, the pilot in command shall notify air traffic control as soon as possible and, if necessary, obtain an amended clearance. However, nothing in this section shall prevent a pilot, operating on an IFR traffic clearance, from notifying air traffic control that he is canceling his IFR flight plan and proceeding under VFR: Provided, that it is operating in VFR weather conditions when he takes such action.

Instrument Flight Rules

§ 60.40 Application. When aircraft are not flown in accordance with the distance-from-cloud and visibility rules prescribed in the visual flight rules, §§ 60.30–60.33, aircraft shall be flown in accordance with the rules prescribed in §§ 60.41–60.49.

§ 60.43 Air traffic clearances. Prior to operating in controlled airspace, an air traffic clearance shall be obtained from air traffic control.

§ 60.47 Radio communications. Within controlled airspace the pilot in command of the aircraft shall ensure that a continuous watch is maintained on the appropriate radio frequencies and shall report by radio as soon as possible the time and altitude of passing each designated reporting point, or the reporting points specified by air traffic control, together with weather conditions which have not been forecast, and other information pertinent to the safety of flight.

§ 60.60 Definitions. As used in this part, terms shall be defined as follows:

Air Traffic Clearance. Authorization by air traffic control for the purpose of preventing collision between known aircraft, for an aircraft to proceed

under specified traffic conditions within controlled airspace.

Controlled airspace. Controlled air space is that airspace designated by the Administrator as the continental control area, control area, terminal control area, or control zone, within which air traffic control service is provided.

## THE PILOT IN COMMAND (CAPTAIN-PILOT) IS RESPONSIBLE FOR THE SAFE OPERATION OF THE AIRCRAFT.

§ 40.351 of the Civil Air Regulations of the Civil Aeronautics Board which were in effect on December 16, 1960, provides as follows:

### Flight Operations

§ 40.351 *Operational control.* The air carrier shall be responsible for operational control.

(c) *Responsibility of pilot in command.* The pilot in command shall during flight time be in command of the airplane and crew and shall be responsible for the safety of the passengers, crew members, cargo, and airplane.

■ The responsibility for the safety of the airplane, and its passengers rests with the Captain-Pilot by regulations having the force and effect of law. Stanley v. United States, 239 F.Supp. 973 (N.D.Ohio 1965), Allegheny Airlines v. Village of Cedarhurst, 238 F.2d 812 (C.A.2, 1956).

■ The responsibility for operational control of an air carrier aircraft rests by law on the air carrier and its pilot. The only relationship which the U. S. had to either the TWA or the UAL aircraft was to provide them with air traffic services in accordance with established procedures. The fact that the pilot may be flying with an air traffic clearance does not relieve him of the responsibility for operational control of the aircraft or for the safety of the airplane and its passengers.

■ There is no question that the U. S. can be liable in tort when the acts of an air traffic controller are the *direct* cause of the harm resulting from the negligent performance of such acts, e. g., clearing two known aircraft to land on the same runway at the same time. United States v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62 (1955) or clearing two known aircraft to use the same airspace at the same time. Cattaro v. Northwest Airlines, Inc., 236 F.Supp. 889 (E.D.Va., 1964). However, part 40 of the Civil Air Regulations has defined in very minute detail the precise responsibilities of the air carrier in its operations. These regulations provide no basis upon which the air traffic controller can be said to be responsible for operational decisions.

■ The case law is clear in holding that the air traffic controller's only responsibility is that of separating one aircraft from another. The Court of Appeals in United States v. Schultetus, 277 F.2d 322, 86 A.L.R.2d 375 (C.A.5, 1960) reversed the district court for placing the pilot's duty upon the shoulders of the air traffic controller. This case involved a mid-air collision between two light aircraft flying in the same traffic pattern. The court stated that the safe operation of aircraft while in the air is the responsibility of the pilot and did so in the following language, at pp. 326–327:

"It seems apparent that the district court had an erroneous concept of the functions and duties of the operators of the control tower. * * * The theory followed by the district court would place upon the operators of the control towers the primary responsibility for the operation of the aircraft at the field. Governmental regulations having the force of law have assigned this responsibility to the operators of aircraft. * * * " (Footnote omitted).

It has been contended many times that the Captain-Pilot should be excused for responsibility because he had been clear-

ed by an air traffic controller for the maneuver requested. The courts have consistently held, however, that the pilot is always directly responsible for the safe operation of the airplane. Wenninger v. United States, 234 F.Supp. 499 (D.Del., 1964), affirmed 352 F.2d 523 (C.A.3, 1965); United States v. Hedburg, 217 F.Supp. 711 (D.C.S.D., 1963); New York Airways v. United States, 283 F.2d 496 (C.A.2, 1960).

The courts have taken a dim view of the motion that an airline can justify a disregard of regulations and proper procedure by pointing the finger of guilt at an air traffic controller. In Southeastern Aviation v. Hurd, 209 Tenn. 639, 355 S.W.2d 436 (1962), Appeal dismissed 371 U.S. 21, 83 S.Ct. 120, 9 L.Ed.2d 96, the air carrier argued unsuccessfully that res ipsa loquitur was inapplicable because at the time of the crash the airplane was under the direction of the FAA control tower. The court held (at pp. 663–664, 355 S.W.2d at p. 447):

"We think there is no merit in this contention. These Aviation Agency employees operating the control tower were merely giving instructions and affording aid to the pilot in making the approach and landing. They were not in control of the plane. Petitioner's employees had exclusive physical control of it."

In Lobel v. American Airlines, Inc., 2 Cir., 192 F.2d 217, the court rejected a contention similar to that now made by petitioner. There, Circuit Judge Jerome N. Frank said:

"We pay little heed to defendant's claim that it did not have exclusive control of the plane because Air-Traffic-Control regulations governed the height at which it had to travel. *It is enough that defendant had complete physical control of the mechanism, even to the point of disregarding regulations for the immediate safety of its passengers.* (Emphasis added).

## NEGLIGENCE

There is no question that UAL 826 had violated its clearance. At the time of the collision it was supposed to be proceeding along Victor 123 in a generally northeasterly direction until it reached the Preston intersection. It received no clearance to go beyond the Preston fix (7228–30). (Numbers such as these otherwise unidentified refer to the pages of deposition testimony). UAL 826 was not authorized to go beyond Preston; its only authority was to fly the Preston holding Pattern (DiGiovanni 7228–30, 7233) and yet it collided with TWA 266 at a point at least seven miles beyond its maximum holding position. The various transmissions over radio communications frequencies at the New York Air Route Traffic Control Center and the Idlewild Tower to and from the Center and Tower were recorded on tape by a tape recorder which had an automatic timing device. The tapes recording the New York Center and Idlewild Approach Tower transmissions were checked immediately after the accident by Edwin Simon, who at the time of the accident was the Assistant Systems Maintenance Sector Chief at the Center, and it was found that the times recorded were only two seconds slow.

At 1528:54 GMT, UAL 826, while on Victor 30, asked DiGiovanni, the Controller, "how far to Victor 123" and was advised "15 make it 16 miles" (6763, 7011–15, 7062).

LaGuardia had no automatic timing device and therefore the time of a message was taken from a clock in its radar room. Smith, the controller for TWA 266, testified that the noise of an open microphone with screaming voices began no later than 1533:32 GMT and ended no later than 1533:49 GMT (10186–208). His supervisor, Albert J. Pachitt, had, after the accident, fixed the time of the collision at 1534 GMT.

Captain Lowell Heacock, a UAL Flight Manager, testified by deposition that UAL pilots are instructed in the manner of holding patterns and although no specific speeds are indicated a UAL crew was to begin the slow-down from its normal operating speed a short time in advance of the fix which marked its holding pattern. The slow-down would start

15 to 20 seconds before the fix if the plane was in level flight and 35 to 45 seconds before the fix if the aircraft was still in the process of decelerating from a higher altitude. It was not UAL's practice to have pilots enter or be in close proximity to holding patterns at approximately normal operating speeds. On the contrary, it was the recommended procedure to enter holding patterns decelerating to as close to 180 knots as possible. Captain Heacock also testified that entering a holding pattern in a terminal area at around 350 knots at 5,000 to 6,000 feet altitude would violate the first rule—safety—of UAL's "Rule of Five," unless the pilot had no control over the situation. The area in which UAL 826 was navigating, the New York Terminal Area, was an area of heavy air traffic as of December 16, 1960 and prior thereto (H 503). Captain Jack R. Liebrich, a National Airlines pilot, described it as a highly saturated area (15085).

It must be remembered that UAL 826 was being operated under IFR. The visibility was bad. Captain Liebrich piloted National Airlines Flight 482 on an IFR flight plan from Norfolk, Virginia to Idlewild, landing at Idlewild at only three to four minutes after the accident. He had filled out a weather questionnaire which he sent to the Civil Aeronautics Board within a few days after the accident and his recollection at the time of the conducting of his deposition in September, 1963, of the weather conditions during the course of his flight was that it was snowing, with large wet snowflakes, light turbulence and a fairly strong southwest wind. The weather was overcast, with heavy gray clouds, visibility zero and no forward visibility (15,105–05; 15,112–15, 15,-119); basically the same weather conditions as at Preston, solid instruments continued throughout the approach to Idlewild. He could barely see his wing tips (15,105; 15,120; 15,124–25). Captain Liebrich testified that it was incomprehensible to exceed the clearance limit at Preston and knowing that it

was a highly saturated area, he would not have dared to exceed the speed limit (15,085). The speed of UAL 826 approaching and around the Preston fix was a vital element. While the actual speed of UAL 826 is not known and from all of the evidence cannot be determined exactly, it is fair to assume that the UAL pilot, plaintiff's decedent, piloted his aircraft at above the normal reduced speed expected in and around the Preston area. This is a fair assumption, arrived at from all the evidence presented, especially the testimony of Captain Liebrich, Captain Heacock and the physical location of UAL 826 at the time of the collision above Miller Field, far beyond its clearance limit. This assumption is also corroborated by three factors: firstly, plaintiff's decedent was a capable pilot and knew the route around Allentown, Preston and the New York area; secondly, no clearance to proceed beyond the Preston fix was issued, yet for some unaccountable reason UAL 826 went beyond its clearance limit, the Preston intersection, where its pilot was expected to make a right turn and fly an elliptical pattern based on the intersection until further clearance to proceed beyond Preston was issued; and, thirdly, plaintiff's decedent, having traveled over this ground many, many times before, must have and should have known, in the exercise of reasonable care, that he had passed the Preston fix.

Captain Irving B. Sommermeyer, who on the date of the accident was a UAL Vice President assisting in responsibility for flight operations including the operating technique for airborne navigational equipment in the DC–8, testified that in attempting to locate the Preston intersection, or any other fix, a pilot will only know these locations by indications he receives on the radio navigational instruments in the cockpit of his aircraft (1186); only these instruments are capable of accurately locating the correct radio beam designating the Preston intersection. Any other method would involve guesswork, a procedure that was discontinued long before the advent of

the jet age and a procedure that could only invite disaster in the flying of modern aircraft, particularly in congested terminal areas. The position of Preston is obtained by the intersection of its 346 degree radial beam and the 050 degree radial of Robbinsville VOR station or the 120 degree radial of the Solberg station.

At 1521 GMT, UAL 826 contacted Aeronautical Radio, Inc., a private corporation, with a message for the Crew Chief at Idlewild. This message read:

"The no. 2 navigational receiver accessory unit is not operative."

UAL 826, however, did not inform the Air Traffic Control Center at Idlewild that this unit was not operative. This failure to inform the Flight Controller that its no. 2 VOR system was inoperative was a clear violation of § 40.361 of the Civil Air Regulations of the Civil Aeronautics Board, which provides:

§ 40.361 *Reporting potentially hazardous meteorological conditions and irregularities of ground and navigational facilities.*

When any meteorological condition or irregularity of ground or navigational facilities is encountered in flight, the knowledge of which the pilot in command considers essential to the safety of other flights, he shall notify an appropriate ground radio station as soon as practicable. Such information shall thereupon be relayed by that station to the appropriate governmental agency.

Captain Heacock testified that as of December 16, 1960 there was a provision in UAL manuals for apprising Air Traffic Control in the event of certain types of failures of navigational equipment in a DC–8, including radio communications equipment (510).

This Court is firmly convinced that the inoperation of the number 2 (two) navigational receiver accessory unit may well have been a contributing cause of the failure to locate the Preston holding area. In Danbois v. New York Central Railroad Co., 12 N.Y.2d 234, page 239,

238 N.Y.S.2d 921, at page 926, 189 N.E. 2d 468, at page 471 (1963) it was held:

In case of a complexly integrated organization like a railroad, affected with a public interest, which, like other large industry, adopts company rules which closely touch the lives of employees as between themselves and in their relations to the public, these should be treated as having some of the characteristics of municipal ordinances or other public regulations. Violation of them, in the conventional phrase, is not negligence in itself but under certain circumstances may be regarded by the trier of the fact as some evidence of negligence.

■ Captain Picune, the pilot of another UAL aircraft which flew into New York from Chicago at about 3 P.M. EST on the day of the accident (about 4 and ½ hours after the accident) made a report on December 28, 1960, twelve days after the accident, concerning an alleged displacement of the 346 degree radial out of Colts Neck which had the effect of putting the Preston VOR fix into an erroneous geographical location (1383–95, 1536–46). Captain Picune made no report to the FAA although he was required by the Civil Aviation Regulations to do so. Since he made no report his evidence must be disregarded as having no bearing on the issue of negligence or contributory negligence.

Captain Wallace was the pilot of UAL 830, a flight from Chicago to Idlewild (2999) which was the plane behind UAL 826, following it roughly by eleven minutes. He testified that he used the 304 degree radial off Colts Neck and experienced no difficulties. He flew back to Chicago that day and then piloted a second flight, UAL 834, to Idlewild, arriving at 6:30 EST. On this second flight he used the 346 degree radial, but his instruments did not show Preston, or did not quite show it (3073–75, 3079–83). Captain Wallace did not report any mal-functioning or irregularity of ground facilities to the New York Center or the Ground Controller, as required by

FAA regulations, § 40.361 and the UAL manuals. Again, the surrounding circumstances of the non-reporting of what might have been a mal-functioning of the 346 degree radial is violative of the rules and cannot be urged as negligence of the defendant or lack of contributory negligence of the deceased.

■ In the case at bar, the evidence is crystal clear that the Colts Neck transmittor was functioning properly. It is also crystal clear that the number 2 accessory unit on UAL 826 was inoperative, yet the crew of UAL 826 did not report this fact to any governmental traffic control center, as required by UAL manuals and Civil Air Regulations. Under these circumstances, this failure to report is evidence of negligence and want of care on the part of the crew, in that had a report been made, Air Traffic Control would have been alerted to a more careful watch of this airplane which could have in effect prevented this collision.

Assuming, arguendo, that Captain Picune and Captain Wallace, on his second flight on December 16, 1960, experienced difficulty with the Colts Neck 346–degree radial, the testimony relating to the difficulty encountered by each is nebulous, if not entirely valueless, in that the times of these alleged occurrences are too remote to be worthy of the Court's consideration, especially so in view of the fact that National Flight 482 and United Flight 830 flew the same course or route under the same IFR conditions and at the same altitude as UAL 826. National 482 immediately preceded UAL 826 from Preston and landed at Idlewild and UAL 830 followed UAL 826 and also landed at Idlewild. Both aircraft were in the New York area at the same time as UAL 826 and reported no difficulty with the Colts Neck radial which they used and landed safely.

Ernest L. Gayle, employed by the FAA as chief of the agency's maintenance division of the Eastern Region, testified by deposition that if any radial had shift-ed, or the power reduced by 15 degrees, an alarm would have sounded at Idlewild (12361–80, 12420–42, 12501–03). He was unaware of any malfunctioning affecting the alignment of a radial which could have occurred without sounding the alarm (12384). Ground checks and flight checks of all the stations involved, namely, Solberg, Robbinsville and Colts Neck VOR, were made and indicated that the performance of all three stations was normal at the time of the accident.

This argument advanced by plaintiff that Colts Neck was not functioning properly is not borne out by any evidence of any of the witnesses and is not at all persuasive. To the contrary, as stated in this opinion, it must be noted that no difficulty was encountered with the Colts Neck 346–degree radial by the plane immediately preceding UAL 826 and the plane immediately following UAL 826.

At 1528:54 GMT, UAL 826 was advised that radar showed it established on Victor 30, 16 miles from the intersection of Victor 123. It was also observed on Victor 123, three miles southwest of Preston. UAL 826 obviously went physically and geographically past the Preston intersection along Victor 123 in that it collided with TWA 266 at a point where Victor 123 crosses Miller Army Air Field (Ex. 29). A study of that exhibit indicates that not only did UAL 826 pass over Preston on Victor 123 but it went past two other intersections, Reynolds and Staten Island, prior to the collision.

It is incomprehensible that UAL 826 could have turned from Victor 30 onto Victor 123 if there was any malfunctioning of the Colts Neck transmitter.

Plaintiff also urges that this Court must take into consideration the fact that the pilots had had many thousand hours of flying experience and are presumed to have acted with diligence and due care. That has been taken into consideration.

In LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, p. 275 (1965)

(C.A.2d), Judge Lumbard wrote as follows:

> Sabena's final claim of error is that the district court erred in refusing to charge the jury that, "because of the human instinct of self-preservation and the disposition of men to avoid personal harm," the crew of the Sabena plane "are presumed to have acted with diligence and due care." This is not an unreasonable presumption, and it is supported by a number of cases. But many, perhaps most, of these cases involve use of the presumption by an appellate court in determining whether a jury verdict is supported by the evidence. E. g., Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62, rev'd in part per curiam, 350 U.S. 907, 962, 76 S.Ct. 192, 100 L.Ed. 796 (1955); Atchison, T. & S. F. Ry. v. Toops, 281 U.S. 351, 356, 50 S.Ct. 281, 74 L.Ed. 896 (1930).

The facts and circumstances presented in this case overcome any presumption of due care here.

■ In opposition to the argument of plaintiff just alluded to this Court must also take into consideration the experience of the Captain-Pilot and crew, not only in number of hours flown by them, but that the route in question had been traversed by this Captain-Pilot many, many times. He was well acquainted with the Preston holding pattern, the Colts Neck transmitter and the route to Idlewild via Preston. It must be conceded that he collided with TWA 266 over Miller Field. UAL 826 was far beyond the outer limits of the Preston area, where it was supposed to be. UAL 826 was directed to use the Preston holding pattern and acknowledged that direction. Controller DiGiovanni had a right to presume that the pilot of UAL 826 would follow instructions and use the Preston holding area as per his clearance. It is also conceded that UAL 826 did not receive any instructions to leave the Preston holding area. It is clearly apparent that UAL 826 was over Miller Field at the time of the accident, a place where it had no right to be. It could be

assumed from the facts adduced in this case that when the pilot of UAL 826 acknowledge instructions on holding at Preston his speed was beyond the range of normal operation for that area. This Court can make a finding to that effect and does so. Additionally, the Court makes a finding of contributory negligence as a matter of law, on the part of the Captain-Pilot, in having collided with TWA 266 above Miller Field, far beyond his direction to hold at the Preston fix, his clearance limit. The Captain-Pilot was clearly negligent and his negligence was a very important factor in causing this collision.

Under 28 U.S.C. § 1346(b), commonly known as the Federal Tort Claims Act, Congress has

> "enacted a rule which requires federal courts, in multistate tort actions, to look in the first instance to the law of the place where the acts of negligence took place." Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed. 2d 492. See also Fleishour v. United States 365 F.2d 126 (7 Cir.) cert. denied 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448; Klein v. United States, 339 F.2d 512 (2 Cir.).

The Court in Richards, supra, also concluded

> "that a reading of the statute as a whole, with due regard to its purpose, requires application of the whole law of the State where the act or omission occurred."

■ Thus the law of the State of New York is to be applied to determine whether the conduct of the employees of the United States, which the plaintiff delineates in her brief, constitutes actionable negligence which would entitle the plaintiff to a judgment against the United States in this action.

■ The basic elements essential to a finding of negligence under the law of the State of New York were clearly stated by the New York Court of Appeals in Kimbar v. Estis, 1 N.Y.2d 399, 153 N.Y.S.2d 197, 135 N.E.2d 708 (1956) and in Outwater v. Miller, 3 Misc.2d 47, 155

N.Y.S.2d 357 (1956). In *Kimbar*, the Court stated, at 153 N.Y.S.2d at page 199, 135 N.E.2d at page 709:

\* \* \* "We turn to the basic proposition of tort law that no action will lie in negligence unless all of the following are present:

(1) the existence of the duty on defendant's part to plaintiff;

(2) a breach of this duty;

(3) resultant injury to plaintiff; and

(4) absence of contributory negligence on plaintiff's own part."

■ In an action for wrongful death such as the instant action, under New York law the defendant has the burden of proof on contributory negligence under § 5–4.2 of the Estates, Powers and Trusts Law, McKinney's Consol. Laws, c. 17–b, formerly § 131 of the Decedent's Estate Law.

■ Negligence may not be presumed on the mere happening of an accident under New York law and it is incumbent on plaintiff's part to show affirmatively by competent evidence that the accident and resultant death of plaintiff's decedent was caused by reason of some breach of duty on the part of the defendant. Flaherty v. State of N.Y., 296 N.Y. 342, 73 N.E.2d 543; McCabe v. State of N.Y., 190 Misc. 11, 73 N.Y.S. 2d 441, affd. 273 App.Div. 1048, 78 N.Y.S.2d 687; Kowalski v. State of N. Y., 7 A.D.2d 762, 179 N.Y.S.2d 925.

■ Under New York law recovery is generally barred if plaintiff's decedent is guilty of any negligence. An exception arises under the New York doctrine of last clear chance, which plaintiff contends should serve to rescue her claim. Under the doctrine, Chadwick v. City of New York, 301 N.Y. 176, 93 N.E. 2d 625 (1950) where the plaintiff has become, through his own negligence, so hopelessly implicated in a dangerous situation that he has lost all ability to extricate himself, responsibility for the ensuing accident may be shifted to one who has a recognizable opportunity to save him.

■ In Kumkumian v. City of N.Y., 305 N.Y. 167, 111 N.E.2d 865, the Court quoted Judge Cardozo in Woloszynowski v. N. Y. Central Railroad Co., 254 N.Y. 206, 172 N.E. 471 (1930) as follows:

"The doctrine of last clear chance, however, is never wakened into action unless and until there is brought home to the defendant to be charged with liability a knowledge that another is in a state of present peril, in which event there must be reasonable effort to counter the peril and avert its consequences. \* \* \* Knowledge may be established by circumstantial evidence, in the face even of professions of ignorance \* \* \* but knowledge there must be, or negligence so reckless as to be token inadvertence to knowledge."

■ The question of knowledge and whether it should have or even could have been reasonably and realistically available to any of the traffic control personnel at a time when it could reasonably have been translated into some form of action reasonably calculated to avert this tragic occurrence has been carefully analyzed by the Court. The evidence that is presented in defendant's argument and indeed the evidence presented at every stage of this case allows an understanding of the air traffic control system, its cooperative nature, the correlated duties shared by both controllers and users of the system and what was reasonably possible under all of the circumstances of this case. The evidence requires the conclusion that there was no opportunity here for an affirmative action that would have or could have altered the tragic course of events that was initiated by the failure to accede to the clearance limit and was thereafter so swiftly concluded. This certainly was not a situation where there was "negligence so reckless as to be token inadvertence to

knowledge. The doctrine of last clear chance clearly does not apply here.

From the foregoing, this Court finds that the defendant was not guilty of any negligence. This Court further finds that the Captain-Pilot of UAL 826 was guilty of contributory negligence as a matter of law. The burden of proving contributory negligence in this particular case is upon the defendant. I further find that the defendant has met that burden.

This Court has considered plaintiff's remaining points but in the light of the foregoing finds no need to discuss them.

Findings of fact and conclusions of law and a decree may be submitted, in accordance with this decision, within the next 30 days.