456

CHRISTINA JASINSKI, as Administratrix of the Estate of MICHAEL JASINSKI, Deceased, Respondent, *v.* NEW YORK CENTRAL RAILROAD, Appellant. (Action No. 1.)

CHRISTINA JASINSKI, as Administratrix of the Estate of MICHAEL JASINSKI, Deceased, Respondent, *v.* COUNTY OF ERIE, Appellant. (Action No. 2.)

Fourth Department, June 25, 1964.

*Vaughan, Brown, Kelly, Turner & Symons (Ogden R. Brown* of counsel), for New York Central Railroad, appellant.

*Gleason, Fitzpatrick, O'Connor & O'Brien (Lawrence H. Wagner* of counsel), for County of Erie, appellant.

*Manz, Johnson & Bayger (Frank R. Bayger* of counsel), for respondent.

Bastow, J. Plaintiff has received by jury verdict a substantial monetary award for the death of her intestate as the result of a collision between a passenger train of the defendant railroad and an automobile at a grade crossing. Separate actions were commenced against the defendant railroad and the defendant county. They were consolidated prior to trial.

Plaintiff sought recovery from the railroad company upon two separate and distinct theories. First, negligent operation of the

train and second, improper design and maintenance of the crossing and appurtenant safety devices. Plaintiff asserted that the defendant county was negligent, among other things, in the manner in which the highways leading to the crossing had been constructed and maintained.

A proper understanding of some of the issues to be passed upon requires a brief description of the physical conditions at this railroad passover that is known as the Dick Road crossing and is located a few miles east of Buffalo in the Town of Cheektowaga. There are four sets of railroad tracks running in substantially an east-west direction and each allocated for use by east and westbound freight and passenger trains respectively. We are here concerned with the two sets of tracks designated for use by passenger trains. The most southerly track was used by eastbound and the next northerly track by westbound passenger trains. The tracks west of the crossing are straight for some 25,000 feet and east thereof for about 20,000 feet.

A traveler approaching the crossing from the south on Dick Road proceeds in a northerly direction to a point about 200 feet south of the crossing where a reverse curve commences. At this point Ellicott Road (which approaches from the west and runs parallel with and south of the railroad tracks) converges into Dick Road. These two roads combine into a single one that crosses the tracks and at the northerly edge thereof again divides. Ellicott Road curves to the right or northeast and then proceeds in an easterly direction again parallel with and north of the railroad tracks. Dick Road bears to the left and continues in a northwesterly direction. Thus, there are three separate approaches to the crossing from the south, northeast and northwest. Each approach is on an ascending grade of roughly 6½ to 7½% for the last 25 or 30 feet before reaching the crossing.

Shortly before two o'clock on the morning of Sunday, September 22, 1957 the fireman on a westbound passenger train when about a mile east of the crossing saw the lights of an automobile and later the vehicle straddle of the south rail of the southerly set of tracks some 25 or 30 feet east of the crossing. At about the same time the witness saw the lights of an eastbound passenger train approaching on the most southerly tracks. Some apparently futile efforts were made by the crew of the westbound train to alert those in the cab of the engine of the eastbound train to the danger that loomed ahead. The testimony of the engineer of the eastbound train was confusing and contradictory but the jury could have found therefrom that when the train was 2,500 feet west of the crossing the engineer saw a

red automobile tail light. The vehicle was 40 feet east of the crossing straddling the south rail. Subsequently, the witness testified that he first knew it was an automobile at the " whistle post " which he placed 1,500 feet west of the crossing. (Actually the distance was 1,661 feet.) He then placed the brakes in a position known as service application as distinguished from (1) service emergency or (2) full emergency. His testimony was that he did not see any " sense in putting on the emergency, we would hit him anyway."

In contrast to this testimony the triers of the fact were privileged to draw somewhat different conclusions from other proof. The speed tape on the engine of the eastbound train disclosed a speed of 65 miles per hour at a point 2,500 feet west of the crossing. At 1,500 feet the speed had increased to 67 miles. The train did not commence to slow down until a point 800 feet west of the crossing and was traveling between 64 and 65 miles per hour as it passed the crossing and struck the vehicle. The train was brought to a stop 2,300 feet east of the point of impact. Thus it might have been found that the train travelled some 3,800 or 4,000 feet from the point the engineer testified that he applied the brakes in service application to the point where it stopped.

While the testimony was controverted by other proof, plaintiff produced and experienced locomotive engineer who testified that traveling at a speed of 64 miles an hour he could have safely stopped the train by use of service application of the brakes in 2,500 feet and by full emergency application in 1,300 to 1,400 feet.

We turn next to the proof as to the manner in which plaintiff's intestate in the automobile arrived at this precarious position straddle of a railroad track some 25 to 40 feet east of the crossing. Here we are met with a complete absence of proof as to events before the collision except for the testimony of the occupants of the cabs of the engines of the two trains that the vehicle was so located. Plaintiff supplied no positive proof as to the activities or whereabouts of her intestate for some 20 hours prior to the accident. The decedent left home for work at 5:30 on Saturday morning. His work hours were from seven in the morning to three-thirty in the afternoon. The payroll records of his employer disclosed that he worked 48 hours in that week but the time cards had been destroyed prior to the trial so there was no certain proof that he had actually worked on Saturday. Moreover, there was no definite proof, except for two facts from which inferences might have been drawn, as to which one of the three approaches to the crossing decedent used to reach the crossing prior to the accident. The first of the two exceptions

was the fact that his place of employment was north of the crossing and his home was south thereof. Any inference to be drawn therefrom would be greatly weakened by the time element that would have placed him on the tracks some 10 hours after the end of his day's work. The second exception was the position of the car headed in a southerly or southeasterly direction. From this fact it might be inferred that decedent had approached the crossing from the north. But any further inference that he definitely approached from the northeast (Ellicott Road) or the northwest (Dick Road) would be of doubtful validity.

It is against this factual background that we consider the several contentions of appellants as to errors in the receipt in evidence of certain proof and ambiguities in the charge that it is claimed mandate a new trial.

Plaintiff presented proof of seven previous incidents where motorists traveling on the Dick Road crossing had driven off the planking and upon the tracks. In four of these the vehicles were proceeding in a northerly direction and in the remaining three the motorists had been approaching from the northwest on Dick Road traveling in a southerly direction. None involved a motorist approaching from the northeast on Ellicott Road. After receiving this proof over objections the trial court instructed the jury in substance that they should first determine whether decedent's car was traveling in a northerly or southerly direction. After making this determination they could consider proof of similar accidents that happened to vehicles proceeding in that direction.

We view these rulings and instructions as erroneous and prejudicial to defendants. While proof of prior accidents may be received to demonstrate that a condition is dangerous or that a defendant had notice thereof (*Annino* v. *City of Utica,* 276 N. Y. 192; *Gastel* v. *City of New York,* 194 N. Y. 15) it is equally well established that " It is not proper, however, to offer such testimony unless it is first shown that the circumstances attending the earlier accidents were sufficiently similar to the relevant conditions prevailing at the time of the later accident." (*Kaplan* v. *City of New York,* 6 A D 2d 489, 491; 10 A D 2d 319, 327.) In other words, the requisite proof of similar conditions must be preliminarily established to the satisfaction of the trial court before the testimony as to the prior accidents is presented to the triers of the fact. Here all of this proof was received before it was shown how the accident happened. The trial court ignored its function and left it to the jury to decide whether or not the requisite proof had been supplied to show similar conditions. This was substantial error prejudicial to defend-

ants. The testimony of some 10 witnesses upon this subject must have impressed the jury. Moreover, there were additional dissimilar conditions. One witness testified he had attended a wedding and had " a few drinks." Another did not know that he was approaching a railroad crossing as he had failed to see either the railway warning sign or a curve sign.

We further conclude that it was error to receive in evidence the three orders of the Public Service Commission. The first made in June, 1948 following public hearings directed the closing and relocation of the Dick Road crossing. This was made upon the petition of the Board of Supervisors of Erie County (cf. Railroad Law, § 91) alleging, according to a recital in the order, that " public safety requires a change in the location and approaches of the existing crossing ". In August, 1948 a further order was made approving contract plans submitted by the railroad. Nearly 10 years later in March, 1958 (and six months after the accident) a further order was made abrogating the two prior orders and dismissing the petition of the Board of Supervisors. This proof opened a wide field for unjustified speculation by the jury. They may have concluded that for 10 years the railroad took no action and in the meantime decedent was killed. This could only be speculation because section 92 of the Railroad Law permits the county "with the approval of the railroad corporation " to acquire by condemnation or otherwise the necessary lands for a relocated crossing. (Cf. *People ex rel. Town of Scarsdale* v. *Public Serv. Comm.*, 220 N. Y. 1.) But this was not explained to the jury. They were told that the Public Service Commission was authorized to direct changes to be made in a reasonable time and the railroad was required to comply. All of this was a collateral issue that would have required full exploration to assess the blame for the delay of 10 years, if indeed, blame there was. This proof was not only inadmissible but highly prejudicial to the defendant railroad.

Lastly, we consider the jury instructions of the trial court. From the foregoing factual recital it is apparent that a recovery by plaintiff against one or both defendants might have been based on different theories depending upon the specific factual findings of the jury. A verdict against both defendants might have rested upon findings that they were negligent in the construction and maintenance of the crossing, the approaches thereto and the surrounding appurtenances. Next, the defendant might have been guilty of ordinary negligence in the operation of the train. As to any of these causes of action the burden of proving the contributory negligence, if any, of the decedent has been placed upon defendants (Decedent Estate Law, § 131)

but this enactment "did not change the common-law standard of care required of such decedent — that being a matter of substantive law." (*Davis* v. *Long Is. R. R. Co.*, 301 N. Y. 450, 454.)

Finally, the facts herein required submission of the case as to the defendant railroad upon the so-called doctrine of "last clear chance." "Where a plaintiff has become, through his own prior negligence, so hopelessly implicated in a dangerous situation that he has lost all ability to extricate himself, responsibility for the ensuing accident may be shifted to the one who has a recognizable opportunity to save him." (*Chadwick* v. *City of New York*, 301 N. Y. 176, 181.) But the doctrine does not come into operation unless there is contributory negligence (*Lee* v. *Pennsylvania R. R. Co.*, 269 N. Y. 53; *Polk* v. *New York Cent. R. R. Co.*, 10 A D 2d 703, affd. 8 N Y 2d 1106). However, if the contributory negligence of decedent and the negligence of the engineer "were contemporaneous and the fault of each operated directly to cause the injury, and were in operation up to the very moment of the collision" the doctrine of "last clear chance" is inapplicable. (*Panarese* v. *Union Ry. Co.*, 261 N. Y. 233, 239.) "There must be a time sequence — an interval in which [decedent's] act of negligence is complete and in which defendant has an opportunity to avert the disaster." (*Kumkumian* v. *City of New York*, 305 N. Y. 167, 173.)

Read in the light of these legal principles the charge of the trial court was inadequate. The basic defect therein was the failure to direct the return of a general and special verdict (CPLR 4111; Civ. Prac. Act, § 459). In view of the general verdict returned against both defendants one may only speculate as to which of the several theories submitted the jury embraced to find negligence on the part of both the county and the railroad.

Moreover, some of these theories of necessity were in direct conflict with others. The jury was never instructed that the doctrine of "last clear chance" was one born of decedent's contributory negligence; that in addition they must find decedent was in a position from which he could not escape; that his original acts of contributory negligence had come to an end and thereafter there was a sufficient period of time in which the employees of defendant railroad had an opportunity to avoid the collision.

A careful elucidation of these rules would have drawn attention to the entirely different legal principles applicable to the other causes of action upon which plaintiff sought recovery from the railroad and the county. These involved claims of ordinary negligence, and contributory negligence, if proved by defendants,

was a bar to recovery. On the other hand, as we have seen, contributory negligence is the starting point for the implementation of the "last clear chance" doctrine. If perchance the jury implemented this doctrine to base an award against the railroad then its verdict as to the county of necessity would have been required to be one of no cause for action. This would be so because the doctrine of "last clear chance", as heretofore stated, is one premised on decedent's contributory negligence which would have been an effective bar to a recovery against either the county or the railroad on any other or different theory tendered by plaintiff and founded on a claim of ordinary negligence by either or both defendants.

The charge read in its entirety was inadequate to guide the jury in deciding the issues, based as they were upon complex and of necessity to some extent conflicting legal principles. But most important was the failure to obtain a special verdict. In the absence of lucid instructions the verdict may have been based on inconsistent findings but this can never be ascertained.

The errors in the receipt of evidence and the basic deficiencies in the charge require a new trial. The judgment and order should be reversed and a new trial granted.

WILLIAMS, P. J., HENRY, NOONAN and DEL VECCHIO, JJ., concur.

Judgment and order unanimously reversed on the law and facts and a new trial granted, with costs to the appellants to abide the event.