■ JOSEPH A. GILLIARD, JR., et al., Respondents, v LONG ISLAND RAILROAD COMPANY, Appellant.—In a negligence action to recover damages for personal injuries, etc., defendant appeals from a judgment of the Supreme Court, Suffolk County, entered March 9, 1977, which is in favor of the plaintiffs, upon a jury verdict. Judgment affirmed, with costs. Plaintiff-respondent Joseph A. Gilliard, Jr., while operating his automobile, struck the side of one of the defendant-appellant's trains at a crossing of the train tracks and a public highway. According to the said plaintiff, his view of the track was obstructed by vegetation which the defendant allowed to grow around the crossing. As he approached the crossing he slowed his automobile from about 25 miles per hour to about five miles per hour. He further testified that he had not heard any horn or whistle signal; area residents also testified that they had not heard any signal prior to the collision. However, the train's engineer and motormen testified that as the train neared the crossing, its bell was ringing and its whistle was blowing. The injured plaintiff was familiar with the crossing and knew that no train was scheduled to pass at the time of the accident. What he did not know was that a special train had been put on by the railroad that day. The defendant was alleged to have been negligent in that (1) its train was operated at a dangerous and excessive rate of speed; (2) it failed to give any warning by bell, whistle, or other device, of the rapid approach of the train; (3) it failed to have proper signals at or near the crossing where the accident occurred; (4) it failed to keep the crossing adequately and properly protected; and (5) it allowed the weeds and trees to grow and, therefore, obstruct the injured plaintiff's vision. The defendant contends that the injured plaintiff was contributorily negligent as a matter of law since, by his own admission, he failed to bring his car to a complete stop before attempting to cross the tracks. We do not agree. In *Schrader v New York, Chicago & St. Louis R. R. Co.* (254 NY 148, 150-152) the Court of Appeals held the law to be: "As a person approaches a railroad crossing in a vehicle he must reduce his speed to a limit which is reasonably safe under the circumstances and conditions and then proceed cautiously and carefully with the vehicle under complete control; *and he must employ his senses of hearing and sight to avoid danger. (Horton v. N. Y. C. R. R. Co., 237 N. Y. 38, 47; Fitch v. N. Y. C. R. R. Co., 233 N. Y. 356.)* If no warning is given of the approach of the train, silence may at times suggest some relaxation of vigilance but not an entire absence thereof * * * This court has never adopted or been influenced by the 'stop, look and listen' rule which was carried to such an extreme in *B. & O. R. R. Co. v. Goodman* (275 U. S. 66, 70) as to suggest a duty to stop and get out of one's vehicle to look up and down the tracks at a dangerous crossing before proceeding. Our rule of conduct is not standardized but it has been stated repeatedly, as in the *Horton Case (supra).* One who approaches any crossing, at any time, or under any circumstances, without taking any precautions for his safety, is guilty of contributory negligence as matter of law." (Emphasis in original.) Notwithstanding the above language rejecting the "stop, look and listen" rule, this court, in *Delaney v Town of Orangetown* (44 AD2d 396, 400, affd 36 NY2d 770), said, as dicta: "Where the crossing is a dangerous one, either because of its location, construction, etc., or because of the elements, the duty of care to be exercised by the motorist is 'commensurate with the obvious risk' *(Crough v New York Cent. R. R. Co.,* 260 N. Y. 227, 232). If the railroad tracks at the crossing are not fully in view in both

directions in the immediate approach to the crossing, due care requires a traveler to stop, look and listen before attempting to cross, and the failure to do so has been held to constitute contributory negligence as a matter of law (see Ann. 41 A. L. R. 398 and New York cases therein cited at p. 407)." Nevertheless, the "stop, look and listen" rule was never adopted and, when the issue presented itself, the failure of a plaintiff driver to stop was found to be merely one fact to be considered by the jury on the question of contributory negligence *(Di Napoli v Long Is. R. R. Co.,* 52 AD2d 589). In the case at bar the jurors were charged, and deliberated, on the issue of contributory negligence. Apparently, as evidenced by their verdict, they found that, in the factual situation presented, all that was required to satisfy the requirement of due care was for the injured plaintiff to have slowed his car to five miles per hour. As a matter of law, there is no reason to disturb that finding. "Courts are reluctant to set aside verdicts of the jury on the sole ground of contributory negligence even in railroad cases" *(Hessner v Delaware & Hudson Ry. Co.,* 46 AD2d 463, 465, affd 38 NY2d 906). We have considered appellant's other contentions and find them to be without merit. Mollen, P. J., Suozzi and Hawkins, JJ., concur; Cohalan, J., dissents and votes to reverse the judgment and dismiss the complaint, with the following memorandum: I dissent. In my judgment Joseph A. Gilliard, Jr. (hereafter referred to as plaintiff),* was guilty of contributory negligence as a matter of law and the jury verdict was against the weight of the credible evidence. Gilliard's testimony disclosed that for a period of five years immediately preceding the accident of September 9, 1970, he had traversed the Champlin Road crossing on an average of three to five times per week. It is fair to assume that he made the return trip in the same fashion. Thus, averaging four times a week, and based on a 50-week work year, he passed over the grade crossing approximately 2,000 times before he met with his accident and sustained the resulting injuries. On the instant occasion he was driving a 1960 Volkswagen northbound and was alone in the car. The radio was not on, nor was the heater. The window on the driver's side was half open and the louver window was pushed out as far as it could go. The weather was poor. There was a drizzling rain. He came to the crossing at about 8:00 A.M. He knew generally the train schedule and that a passenger train went west on the single track shortly before 8:00 A.M. Gilliard testified he neither saw nor heard the oncoming eastbound train until he was five feet south of the south rail of the track, proceeding at about five miles per hour. The inescapable fact is that plaintiff illustrated an utter disregard for his own life and safety. Common sense would dictate that one cannot rely on train schedules alone. Freight trains and other nonscheduled operations pass at grade crossings innumerable times during the course of the year. To quote the old bromide, "familiarity breeds contempt". Plaintiff proved to be the victim of his own carelessness. As noted in *Schrader v New York, Chicago & St. Louis R. R. Co.* (254 NY 148, 150): "As a person approaches a railroad crossing in a vehicle he must reduce his speed to a limit which is reasonably safe under the circumstances and conditions and then proceed cautiously and carefully with the vehicle under complete control; *and he must employ his senses of hearing and sight to avoid danger."* (Emphasis in original.) In passing, it is worthy of note that Gilliard apparently had normal sight and hearing. The court in *Schrader* further added (p 151): "These are circumstances which may make it proper

---

* The cause of action of plaintiff Margaret Gilliard is of a derivative nature as the wife of Joseph A. Gilliard, Jr.

to submit the case to the consideration of the jury. But when one, familiar with the crossing, as deceased was, is heedless of ordinary precautions in a place which he knows to be dangerous, no question remains for a jury to pass on. The evidence in this case points conclusively to a total lack of care on the part of the deceased." The verdict for defendant in *Schrader* was affirmed. In *Wadsworth v Delaware, Lackawanna & Western R. R. Co.* (296 NY 206), plaintiff's intestate was killed at a railroad crossing under factual circumstances quite similar to those at bar. The deceased had traversed the railroad crossing on many, many occasions. On the day he met his death a warning whistle was concededly sounded, but the factual question revolved around the timeliness of the signal. In reversing a judgment for plaintiff and dismissing the complaint, the court, per Judge Lewis, said (p 212): "Having driven a truck across those tracks at that point daily for a period of five years he knew, or in the exercise of reasonable care he should have known, that the danger reasonably to be apprehended at that crossing required of him to be alert and careful for his own safety. 'The omission on the part of the railroad company of some usual act, purposed to give warning to travelers on the highway may tend to throw one off his guard; but it does not justify the nonobservance of ordinary care on his part.' *(Avery v. N. Y., O. & W. Ry. Co.,* 205 N. Y. 502, 506.)" It is an obvious truth that railroads run on tracks. They can turn neither right nor left except as the tracks permit. Also, they have the right of way at crossings *(Hicks v Erie R. R. Co.,* 10 AD2d 795). Here, looking west from the intersection, the track is straight as a die for at least 1,400 feet. The diesel locomotive stood 16 feet in height and was 68 feet long. It was drawing several coaches, each of which was 74 feet long. In the vicinity of the accident scene, the embankment on the south side of the track is no more than seven feet high at the highest. Undergrowth and bushes grow close to the rails, as they did for the five-year period alluded to above. The plaintiff's car struck the first coach about 125 feet back from the nose of the locomotive. On the question of noise, a nearby neighbor called by plaintiff testified, *inter alia,* that the volume of sound from the locomotive "Can tear your house down, seem[s] like it." The same witness said he did not hear a horn or whistle blow before the train negotiated the crossing on this occasion. Other witnesses for plaintiff also testified in a similar vein. Such negative testimony is, of course, acceptable *(Latourelle v New York Cent. R. R. Co.,* 301 NY 103). However, the circumstances belie the testimony of these self-styled disinterested witnesses. On the day of the accident arrangements had been made to run a nonscheduled train from Jamaica to Montauk. A handpicked crew had been selected for the purpose. The reason for the trip was for the newly appointed president of the railroad (Walter Schlager) to inspect the company's operations. He was accompanied by a number of railroad executives. In the light of these circumstances it strains credulity to the breaking point to give credence to the testimony of plaintiff's witnesses which, at least by implication, suggested that no warning signals were given. First, it would be ludicrous for a handpicked engineer to jeopardize his long-held job by brazenly failing to obey the rules and regulations in view of his important living cargo, plus the fact that two other railroad men were in the cab of the diesel with him, and, second, he would have been committing a crime if he had not given the warning signals mandated by section 53-b of the Railroad Law. Surely this is one instance where the positive testimony far outweighs the negative. Furthermore, if a warning signal was given, then plaintiff should have stopped "not less than fifteen feet from the nearest rail of such railroad" (see Vehicle and Traffic Law, § 1170, subd [a], par 3). One of the plaintiff's

witnesses volunteered the information that a prior accident had taken place at the Champlin Road crossing in December, 1964; a second witness attested to its occurrence. Despite the fact that no serious attempt was made to demonstrate any point of similarity between the two happenings, the trial court, over objection, permitted the testimony to stand. Such meager facts as were elicited indicated that the earlier accident happened in the nighttime; the instant accident occurred in broad daylight. No relevant testimony was adduced to indicate who the victim was, or his or her physical condition, or age, or state of health or sobriety. Nor were the weather conditions explored. No attempt was made to show whether the car windows in December of 1964 were open or closed; whether, perhaps, a heater was fogging the windows; what familiarity, if any, the victim had with the physical aspects of the crossing; and whether a warning signal was given and heard. The trial court fell into the same trap as did the trial court in *Flansburg v Town of Elbridge* (205 NY 423). There, two accidents happened at or near the same culvert within a public highway, the first in December, 1907, the other in September, 1908. In reversing a verdict for the plaintiff as to the 1908 accident, the court remarked (p 431): "This occurrence [of December, 1907] was under conditions wholly dissimilar to those attending the injuries to the plaintiff. Proving it did not tend to prove that the condition of the place of the accident to plaintiff made it dangerous at that time or ever before. The testimony did not impart to the jury any truth which justly or with fairness to the defendant should have entered into their deliberations and its admission was error." (Matter in brackets supplied.) (See, also, *Jasinski v New York Cent. R. R.,* 21 AD2d 456.) As in *Flansburg,* the receipt of testimony herein as to the prior accident was substantial error calling, at the very least, for a new trial. Grievous error also occurred when the trial court admitted, over objection, the testimony of an expert as to safety conditions at the crossing. It had already been established by oral testimony and photographic exhibits that the defendant had complied with both section 53 ("Sign boards * * * at crossings") and section 53-a ("Warning signs") of the Railroad Law. And absent any direction from the Commissioner of Transportation, the defendant did not have to take any further steps for the safety of the general public. In practical effect, the minimum safety rules prescribed by the cited sections of the Railroad Law became the maximum requirements. As was stated in *La Rocco v Penn Cent. Transp. Co.* (29 NY2d 528, 530 [a wrongful death action]): "The possible obstruction by the embankment to viewing the railroad tracks from the road may have a material bearing upon decedent's contributory negligence or upon defendant's negligence in operating the train, but not, without more, upon the question of negligence in maintaining the crossing (see *Cordell v New York Cent. & H. R. R. R. Co.,* 70 N. Y. 119, 123). Consequently, the instructions with respect to negligence in maintaining the crossing * * * must be deemed prejudicial." Finally, I note the majority's statement, citing *Hessner v Delaware & Hudson Ry. Co.* (46 AD2d 463, affd 38 NY2d 906), that "Courts are reluctant to set aside verdicts of the jury on the sole ground of contributory negligence even in railroad cases". That case was affirmed February 19, 1976. Yet, in *Winnick v New York State Elec. & Gas Corp.* (38 AD2d 623, affd 32 NY2d 624), in a nonrailroad case, a jury verdict for plaintiff was reversed on the stated ground that plaintiff was contributorily negligent as a matter of law. Here we have much more than plaintiff's contributory negligence—as a matter of law—to support a reversal of the jury verdict.