■ ADA RIVERA, Individually and as Administratrix of the Estate of MILTON RIVERA, Deceased, Respondent, v NEW YORK CITY TRANSIT AUTHORITY, Appellant.—Judgment, Supreme Court, New York County (Francis N. Pecora, J.), entered January 5, 1989, which, upon a jury verdict in favor of plaintiff in the amount of $2.2 million, apportioning liability 85% to defendant and 15% to plaintiff's decedent, and upon denial of defendant's motion to set aside the verdict, awarded plaintiff the sum of $1.7 million for decedent's wrongful death and $170,000 for decedent's conscious pain and suffering, affirmed, without costs.

Plaintiff's decedent was killed when he was struck by a subway train after he fell from the platform of the 42nd Street and Sixth Avenue station. In reports filed with the Transit Police Department and the Transit Authority Transportation Department after the incident, the motorman of the train stated that he saw the decedent staggering on the platform prior to falling onto the tracks. Other passengers awaiting the arrival of the train had also told the police that they had noticed the decedent acting in an erratic manner

prior to his fall. In his deposition, the motorman testified that he entered the 42nd Street station at approximately 5 to 10 miles per hour and that he was 30 to 60 feet away when he first saw the decedent fall. However, at trial, the motorman stated that he entered the station "under twenty-five miles per hour" and then, when asked to be more specific, testified that he was proceeding at "10, 15, 20 miles per hour" as he approached the station. He also indicated at trial that he first observed the decedent fall from 30, 45 or 60 feet away. Contrary to the statements he made shortly after the incident, at trial, some eight years after the accident, the motorman testified that he observed the decedent "staggering" off the platform and that "staggering" meant "falling".

In the opinion of plaintiff's expert, a traffic and safety engineer, the combination of the speed of the train and the time taken by the motorman to place the train into emergency, which merely involved the releasing of a handle, caused the accident. This expert based his opinion on the various statements of the motorman and the passengers on the platform as to the speed at which the train was traveling, the time when the motorman first observed the victim and the time he put the train into emergency, the location of the victim's body after the train stopped and the distance between the location of the body and the front of the train. He also reviewed rules, regulations and charts promulgated by the Transit Authority. The expert arrived at his conclusions by basing his calculations on the minimum and maximum speed and distance approximations reported by the motorman in his various statements. It was the opinion of plaintiff's expert that the motorman should have been able to stop the train before hitting the decedent.

Defendant's expert estimated that the train was traveling between 18 and 21 miles per hour when it entered the station. He disagreed with the calculations arrived at by plaintiff's expert because they failed to consider such factors as humidity and the grade of the hill on the tracks leading into the station. In his opinion, the accident was unavoidable.

The experts disagreed as to the significance of rule 36 (j) of the Transit Authority Rules and Regulations, which prohibits any train from exceeding 15 miles per hour when passing a station. Plaintiff's expert stated that the regulations must logically apply to passenger trains stopping at a station as well, while defendant's expert found no reason to apply the rule to trains which stop to let passengers on and off at

stations. However, he conceded that one reason why the rule was enacted was to protect passengers standing on platforms.

We find that the jury's determination was in accordance with the weight of the evidence. "For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence * * * [i]t is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial. * * * [I]n any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence (see *Middleton v Whitridge* [, 213 NY 499], pp 507-508)" *(Cohen v Hallmark Cards,* 45 NY2d 493, 499).

While it is true, as the dissent suggests, that the opinion of an expert is not always sufficient to make out a prima facie case *(see, Topel v Long Is. Jewish Med. Center,* 55 NY2d 682; *Tarter v Schildkraut,* 151 AD2d 414, *lv denied* 74 NY2d 616), it is also well settled that the weight to be afforded the conflicting testimony of experts is a matter "peculiarly within the province of the jury" *(Sternemann v Langs,* 93 AD2d 819; *see also, Norfleet v New York City Tr. Auth.,* 124 AD2d 715, 716, *lv denied* 69 NY2d 605; *Chodos v Flanzer,* 109 AD2d 771). The jury was presented with the opinion of both experts as to the applicability of rule 36 (j) and the proper speed at which a passenger train should enter a station. Plaintiff's expert's testimony regarding the reaction time of the motorman after seeing the decedent staggering on the platform did not amount to speculation or conjecture but rather, was based on the statements of the motorman himself *(cf., Cassano v Hagstrom,* 5 NY2d 643, *rearg denied* 6 NY2d 882). His opinion was, therefore, supported by facts disclosed by the evidence *(cf., Matter of Aetna Cas. & Sur. Co. v Barile,* 86 AD2d 362).

Defendant's request for a charge on the common-law standard of care in emergency situations was properly denied. PJI 2:14 sets forth the standard of care to be followed by a person faced with an emergency situation who acts without opportunity to consider alternatives. The reasonableness of the course of action pursued by the motorman after the emergency arose *is* not disputed. Placing the train into emergency was the only alternative available *(cf., Ferrer v Harris,* 55 NY2d 285, *mod* 56 NY2d 737; *Rossman v La Grega,* 28 NY2d 300; *Walker v Barnwell,* 122 AD2d 605).

Defendant and the dissent maintain that the introduction into evidence of the New York City Transit Authority Rules and Regulations was improper and that this error was exacerbated by the court's charge which, they contend, permitted the jury to determine "the applicability of any of the more than 150 rules." It should be noted that the applicability of the rules was first raised by defense counsel during cross-examination of plaintiff's expert and was again explored by him on direct examination of defendant's experts. After defense counsel sought to introduce rule 36 into evidence, plaintiff's counsel requested that the entire rule book be admitted since plaintiff's expert testified that he had reviewed all of defendant's rules and regulations before arriving at his conclusion. The court admitted the rule book into evidence.

Although the rule book contained certain irrelevant material, its admission into evidence did not deprive defendant of a fair trial. Defendant brought the issue of the rules to the jury's attention and was not prejudiced by their admission into evidence. Although the Court of Appeals has held that a rule which imposes a higher standard of care than that owed by defendant is inadmissible (*Crosland v New York City Tr. Auth.,* 68 NY2d 165), the record reveals that a rule imposing such stricter standard was never at issue in this case. Moreover, the court's charge instructed the jury on the proper standard of care to be applied (*see, Danbois v New York Cent. R. R. Co.,* 12 NY2d 234).

We further find that the record supports the damages awarded by the jury. The decedent was 29 years old at the time of his death and was the sole means of support for his wife and three-year-old son. Both expert and lay witnesses testified, *inter alia,* to the decedent's employment history, job performance, income at death and future earning potential. Such testimony amply supported the jury verdict (*see, DeLong v County of Erie,* 89 AD2d 376, *affd* 60 NY2d 296). Although the trial court should have instructed the jury, pursuant to defendant's request, that any verdict awarding damages must be itemized (CPLR 4111 [f]), the failure to do so does not warrant reversal.

We have considered defendant's remaining contentions and find them to be without merit. Concur—Kupferman, J. P., Rosenberger and Asch, JJ.

Sullivan and Smith, JJ., dissent in a memorandum by Smith, J., as follows: I would reverse the judgment because (1) the trial court refused to charge on the law which is applic-

able when a motorman is faced with an emergency situation; (2) the jury verdict was against the weight of the evidence; (3) the court permitted the jury to consider more than 150 rules and regulations with no guidance, including a rule which the Court of Appeals has held is inadmissible; and (4) the award was excessive.

Plaintiff's husband, Milton Rivera (Rivera) was struck and killed by a train when he fell from a platform at the 42nd Street and Sixth Avenue subway while a train was entering the station. The accident occurred on January 11, 1980 at about 7:00 P.M.

Witnesses testified that while waiting, Rivera acted in an erratic manner, staggering about the platform, but that for 10 to 15 seconds just prior to his fall he stood steadily on the edge of the platform. Rivera was found under and approximately 53 feet back from the front of the first car of the train. He died several hours later during surgery. An autopsy failed to reveal the presence of alcohol or narcotics.

At trial the motorman testified that he saw the decedent stagger off the platform, some 30 to 60 feet in front of the train, and immediately activated the emergency brake.

The theory of plaintiff's case was that the speed at which the train entered the station was excessive and that the motorman observed the decedent staggering but failed to activate the train's braking mechanism until after the decedent began to fall towards the tracks.

Plaintiff's engineering expert, Dr. Edmund Cantilli, estimated the speed of the train to be 19 to 22 miles per hour (m.p.h.). He reached this conclusion based in part upon Transit Authority charts as to the train's stopping distance and upon the motorman's statement that he immediately applied the brakes when, from approximately 30 to 60 feet away, he saw Rivera fall. Based upon the location at which Mr. Rivera was found, assuming that he had fallen off the platform at that point, Dr. Cantilli concluded that the train had come to rest some 83.6 to 113.6 feet after the braking system was activated.

Dr. Cantilli further testified that the motorman's postaccident report, stating that the decedent "staggered and fell", indicated a preaccident realization by the motorman that Rivera was stumbling, thus adding some 4 to 7 seconds within which the motorman observed Rivera prior to the fall. Thus, he concluded, if the train was traveling at 20 m.p.h., the motorman would have first observed Rivera staggering from a

distance of some 120 feet (30 feet per second for four seconds). Adding the minimum braking distance of 83.6 feet to this 120 feet, he posited that the motorman had observed the deceased from a minimum distance of 203.6 feet. Employing the same reasoning, he concluded that had the motorman observed the staggering for seven seconds, he would have observed the staggering from a maximum distance of 231 feet before braking. Adding 231 to his maximum calculated braking distance from 60 feet away, 113.6 feet, he concluded that the motorman observed the deceased from as much as 344.6 feet away. On cross-examination he indicated that Rivera had fallen approximately 160 feet from the beginning of the platform and that a tunnel exists before that point.

Cantilli rendered his opinion that 19 to 22 m.p.h. was an excessive rate of speed for a passenger train entering a station to discharge and take on passengers. In his opinion, had the train been traveling at 10 m.p.h., a safe rate of speed, it would have stopped within 24 feet of the brakes being applied, thus avoiding the accident. He concluded that the accident had been caused by a "combination of the speed of the train and the time taken by the motorman to activate the braking system."

Norman Marcus, a mechanical and civil engineering expert called by defendant, similarly concluded, based upon the motorman's observation of the fall from 30 to 60 feet away, that the train was traveling at between 18 and 21 m.p.h. upon impact. However, he indicated that because of a 2.6% upgrade in the track entering the station, it would not be possible for most trains coming into the station to maintain a speed of 10 to 15 m.p.h. He indicated that speed of at least 17 m.p.h. is necessary in order to make the grade. Moreover, he offered that rule 36 (j), which requires that a train passing a station travel no faster than 15 m.p.h. with its whistle blowing, applied primarily to work trains, which have different braking systems, and was intended to give track workers ahead of the station notice that a train was en route and would not first stop at the station. It was his opinion that the rule clearly had no application herein and that 18 to 21 m.p.h. was a reasonable rate of speed for a train entering a station to discharge and pick up passengers. Marcus offered that the standard reaction time for a trained motorman to activate the braking mechanism is one second, rather than .15 to .25 second as suggested by Cantilli, and calculated that the actual fall to the tracks took approximately 1.1 or 1.2 seconds.

First, under the circumstances of this case defendant re-

quested and was entitled to a charge of what the law requires when a motorman is faced with an emergency situation. Defendant was entitled to a charge on how to evaluate the actions of the motorman and how to assess what conduct was reasonable under the circumstances here. PJI 2:14, which sets forth the applicable standard in an emergency, was clearly applicable.

Second, the verdict was against the weight of the evidence. More is required to make out a prima facie case than a difference of opinion between experts. *(See, Topel v Long Is. Jewish Med. Center,* 55 NY2d 682, 684 [1981], and cases cited thereunder.)

It is true that in many instances the cause or effects of an accident can be determined in no way other than by the opinions of experts especially qualified by training and experience. However, expert opinion evidence must be based either on facts disclosed by the evidence or by facts within the expert's personal knowledge. An expert may neither guess nor speculate. *(Matter of Aetna Cas. & Sur. Co. v Barile,* 86 AD2d 362, 364 [1st Dept 1982], citing, *inter alia, Cassano v Hagstrom,* 5 NY2d 643 [1959]; *Marx v Ontario Beach Hotel & Amusement Co.,* 211 NY 33, 39 [1914].)

Plaintiff's contention that the motorman could have avoided running over Rivera if he had applied his brakes immediately upon seeing Rivera hinges entirely upon plaintiff's interpretation of a postaccident report stating that Rivera "staggered and fell". Both the motorman's deposition testimony, offered by plaintiff in evidence, and his trial testimony reveal no evidence of staggering immediately prior to the fall. To the contrary, an eyewitness, Jack Lichaa, offered testimony that 10 to 15 seconds prior to the accident, Rivera stood in a steady manner near the edge of the platform. Nonetheless, plaintiff's case rests heavily upon Dr. Cantilli's conjecture that the motorman would have observed Rivera staggering for 4 to 7 seconds before throwing the train into emergency and that this delay contributed in no small part to the accident.

Similarly, plaintiff's evidence that a speed greater than 10 to 15 m.p.h. is excessive speed was scant at best. According to Dr. Cantilli this conclusion was based on a review of the regulations and operating manuals of the Authority and on rule 36 (j) in particular. However, rule 36 (j) admittedly did not address passenger trains stopping at a station. It was Dr. Cantilli's opinion that since that rule required a maximum speed of 15 miles per hour for trains not stopping at the

station, any greater speed for trains stopping at a station was excessive.

Third, introduction in evidence of the more than 150 rules and regulations of the Transit Authority was improper and worked a substantial prejudice to the defendant. *(Crosland v New York City Tr. Auth.,* 68 NY2d 165, 168-169 [1986] [rule which set a standard of care higher than required by law inadmissible]; *Grant v Metropolitan Transp. Auth.,* 67 AD2d 611 [1st Dept 1979] [error to admit rule which did not express any standard of care].) It was conceded that no rule sets an explicit speed for a passenger train entering a station at which it is going to stop. Nevertheless, the court's charge left it to the jury to determine the applicability of any of the more than 150 rules. "This proof opened a wide field for unjustified speculation by the jury." *(Jasinski v New York Cent. R. R.,* 21 AD2d 456, 461 [4th Dept 1964].)

The rules and regulations introduced included rule 85 which states in part, "Employees must take every precaution to prevent accidents or injuries to persons or damage to property." The Court of Appeals has explicitly stated that this rule is inadmissible since it imposes a standard higher than that which the defendant owes to passengers. *(Crosland v New York City Tr. Auth.,* 68 NY2d, *supra,* at 168-169.)

Fourth, the award of $2 million for wrongful death "deviates materially from what would be reasonable compensation." (CPLR 5501 [c]; *Walsh v 175 Water St. Partners,* 109 AD2d 690 [1st Dept 1985] [$953,000 was adequate in death of construction worker survived by a wife and two young children]; *Albarran v City of New York,* 80 AD2d 784 [1st Dept 1981] [award of $330,000 reduced to $261,000 where the 39-year-old deceased earned $17,000 annually and was survived by a wife and two small children]; *Allen v New York City Tr. Auth.,* 148 AD2d 563 [2d Dept 1989] [$890,000 awarded for death of 36-year-old woman survived by two minor children where evidence of economic loss was $695,000].)

At the time of his death in 1980, Rivera, who was 29 years of age, was one of four supervisors of a small group of laser printers earning approximately $18,000 per annum. He had recently been given the title of assistant manager. Rivera was survived by his wife and three-year-old son.

Dr. Nowak, an economist testifying for plaintiff, calculated Rivera's loss of earnings through age 65 as $1,243,357. She arrived at this figure based upon the yearly salary of a co-worker of Rivera who at the time of trial was earning $40,000.

The co-worker had attended three years of college and had been an assistant manager for 1½ years. Rivera, however, attended college for a few months and had been a manager for only two or three months.

The defendant's economist, Dr. Fitzgerald, estimated between $639,423 and $1,252,518 in lost earnings, based upon the assumption that Rivera's earnings would have increased to $40,000 in 1988 and thereafter at the rate of 5.72% annually. Dr. Fitzgerald utilized United States Bureau of Labor Statistics in calculating a work expectancy for Rivera of 30.46 years. He subtracted from estimated future earnings 21.5 to 30.4% for personal expenditures.

If the $2 million awarded by the jury brought a conservatively estimated interest of 5.25% annually, plaintiff and her son would receive a yearly interest on the proceeds of approximately $105,000. (Morales v City of New York, 115 AD2d 439 [1st Dept 1985], lv denied 67 NY2d 605.) This sum is clearly excessive given the financial history, education and expectations of the deceased. The difference between the experts' calculation of net economic injury and the $2 million award is not otherwise supported by the record. (Allen v New York City Tr. Auth., supra.)

Moreover, the trial court improperly denied a request by the Transit Authority that it instruct the jury that any verdict awarding damages be itemized. (CPLR 4111 [f].)